**PITTSBURGH–DES MOINES STEEL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16690.

United States Court of Appeals
Ninth Circuit.

Nov. 15, 1960.

John B. Lauritzen, James H. Wolpman, San Francisco, Cal., for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Margaret M. Farmer, Attys., N. L. R. B., Washington, D. C., for respondent.

Before STEPHENS, BONE and HAMLIN, Circuit Judges.

BONE, Circuit Judge.

Petitioner, the Pittsburgh-Des Moines Steel Company, fabricates and sells steel products in interstate commerce. It operates manufacturing plants at Pittsburgh, Pennsylvania, Des Moines and West Des Moines, Iowa, and Santa Clara and Fresno, California; it maintains warehousing facilities at Santa Clara, Fresno, Sacramento, Stockton and El Monte, California. There is no question but that petitioner must conform to the strictures of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq.

Since sometime prior to 1946, petitioner has customarily made gifts of Christmas bonuses to the employees at its various plants and facilities. From 1946 through 1950 all of the Company's employees received yearly yuletide bonuses even though workers at the Pittsburgh plant had struck for 12 days in 1946, and for 12 to 14 days in 1947. In 1951 all employees were given a bonus with the exception of those in the production and maintenance unit organized by the United Steelworkers of America at the Pittsburgh plant. These men had struck for 46 working days during the year. From 1952 through 1955 all employees received bonuses except for the men at the Fresno plant in 1955; the Fresno installation had not been bought by Pittsburgh-Des Moines until August of that year. In 1956 no bonus was paid to any of the Company's employees. In 1957 all employees got a bonus except for the members of the production and maintenance unit organized by the Steelworkers at the Santa Clara plant. These workers had carried on an economic strike for a total of 57 working days during 1957. No contractual provision has ever obligated the Company to award Christmas gifts; the bonuses have always been gratuitous.[1]

The Company's failure to grant a bonus to the production and maintenance workers at Santa Clara in 1957 resulted in the unfair labor practice charges presently before us on review. The National Labor Relations Board found that petitioner had violated § 8(a) (1) and (3) of the Act, 29 U.S.C.A. § 158(a) (1) and (3) by restraining its employees from engaging in a strike protected by § 7 of the Act, 29 U.S.C.A. § 157, and by discouraging its employees from participating in such protected activity by discriminating against them in regard to a term or condition of their employment. In reaching its conclusions the Board overruled its Trial Examiner, who found that the Company had traditionally

1. During collective bargaining negotiations in 1956, the Steelworkers Union, on behalf of the production and maintenance unit at Santa Clara, tried to get the Company to insert in the bargaining contract a past practices clause which would have obligated the Company to continue all customary practices and procedures which it had carried on in the past, including the gratuitous Christmas gift.

The Company specifically refused to enter into an agreement which would require as a matter of contract that it give the yearly Christmas bonus. It maintained that the bonus had always been and should remain voluntary and gratuitous on its part. So, although other past practices were contractualized, the Christmas gift was not.

awarded bonuses pursuant to a plan called the Five Factor Formula, that this formula was used in 1957, that its use did not establish ipso facto that the Company intended to discourage economic strikes by discriminating against those who took part in them and that consequently there was no violation of the Act. The Board, on the contrary, ruled that the Company did not use the Five Factor Formula in regard to the Santa Clara production and maintenance workers in 1957, that these employees were denied bonuses solely because they had engaged in a prolonged strike and that even if the Five Factor Formula had been applied, its use alone constituted sufficient proof that the Company did intend to discourage and interfere with protected activity by discriminating against the strikers in regard to the customary bonus. The Board concluded that petitioner had violated § 8(a) (1) and (3) and issued its order accordingly.

The crux of a violation of § 8(a) (1) or (3) is the true purpose or real motive of the employer in taking the action complained of. N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893; Associated Press v. N. L. R. B., 1937, 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953; Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 42–44, 74 S.Ct. 323, 98 L.Ed. 455. And the sole question in this case, *as phrased by both parties*, is whether or not the Board's finding that the motive for withholding the bonus to members of the Santa Clara production and maintenance unit was to penalize them because they engaged in a prolonged strike is supported by substantial evidence.

The Company's position is that of the Trial Examiner: the Five Factor Formula was applied in 1957 as in preceding years, bonuses were not denied to the strikers at Santa Clara merely because they struck, and the application of the formula does not constitute the type of discrimination from which, without specific evidence of motive, the Board might infer that the Company intended to discourage protected activity. See Radio Officers' Union, etc. v. N. L. R. B., supra, 347 U.S. at pages 44–48, 74 S.Ct. at pages 337–339. If, however, the basis by which petitioner claims it selects deserving employees, i. e., the Five Factor Formula, cannot be differentiated from the type of discrimination which in Radio Officers' was held to create an irrebuttable inference of intent sufficient to support findings of unfair labor practices, petitioner cannot here prevail. We look initially to the manner in which the Five Factor Formula in theory discriminates.

The five factors are: (1) overall results, (2) overall productivity, (3) results at each individual plant, (4) productivity at each individual plant, and (5) continuity of work effort at each individual plant. The first two factors are used to determine whether petitioner has had sufficient overall earnings during the year to justify granting a bonus to any of its employees. If examination of these two factors reveals that operations have been sufficiently profitable to warrant payment of a bonus, the work at each of the Company's plants is evaluated in order to determine which employees should or should not be rewarded. Factor 3, the results at individual plants, is apparently determined by profit and loss figures. These figures, however, testified Cedric A. Fegtly, a witness for the Company, do not differentiate as to efficiency among the various groups of employees working out of each plant. This is because the Company does designing and construction work in addition to fabrication, the work done in the shop, and the profit or loss realized from all three activities is apparently lumped together to form the profit or loss total for each plant. Consequently, to determine the efficiency or productivity of each of the various groups of employees working in or out of a single plant, the Company looks to the fourth factor, the productivity of the individual plant. This is determined by the balance or imbalance in what the Company refers to as the

plant's administration account. Such an account is apparently kept for each of petitioner's installations, or at least for its manufacturing facilities.[2]

2. Petitioner introduced into evidence a "Summary of Administration Results, 1946–1957" for all of its manufacturing or fabricating plants with the exception of the Fresno facility. Since the figures appearing in this document and their implications will be of some significance in later discussion, we think it convenient to reproduce the Summary below:

Summary of Administration Results, 1946–1957

+ Indicates Credits exceeded Costs and Income resulted
− Indicates Costs exceeded Credits and Loss resulted

| ADMINISTRATION | | Pittsburgh | Des Moines | Santa Clara | W. Des Moines |
|---|---|---|---|---|---|
| 1957 | Costs | 2,222,621 | 1,229,964 | 624,735 | 443,206 |
| | Credits | 2,517,754 | 1,321,423 | 424,265 | 415,661 |
| | | + 295,133 | + 91,459 | −200,470 | − 27,545 |
| 1956 | Costs | 2,103,214 | 939,946 | 537,323 | 347,325 |
| | Credits | 2,193.099 | 694,362 | 488,405 | 215,636 |
| | | + 89,885 | − 245,584 | − 48,918 | −131,689 |
| 1955 | Costs | 1,867,843 | 1,043,801 | 502,296 | 211,356 |
| | Credits | 1,822,871 | 935,026 | 416,732 | 81,247 |
| | | − 44,972 | − 108,775 | − 85,564 | −130,109 |
| 1954 | Costs | 2,185,230 | 1,341,896 | 430,975 | |
| | Credits | 2,105.196 | 1,229,270 | 368,541 | |
| | | − 80,034 | − 112,626 | − 62,434 | |
| 1953 | Costs | 2,037,501 | 1,147,122 | 281,829 | |
| | Credits | 1,801,029 | 1,116,156 | 364,282 | |
| | | − 236,472 | − 30,966 | + 82,453 | |
| 1952 | Costs | 1,611,726 | 882,138 | 256.959 | |
| | Credits | 1,538,356 | 925,033 | 249,952 | |
| | | − 73,370 | + 42,895 | − 7,007 | |
| 1951 | Costs | 997,701 | 706,137 | 219,910 | |
| | Credits | 809,960 | 699,044 | 181,670 | |
| | | − 187,741 | − 7,093 | − 38,240 | |
| 1950 | Costs | 936,890 | 598,278 | 172,039 | |
| | Credits | 719,008 | 566,916 | 160,382 | |
| | | − 217,882 | − 31,362 | − 11,657 | |
| 1949 | Costs | 912,686 | 520,464 | 136,128 | |
| | Credits | 828,853 | 509,491 | 108,878 | |
| | | − 83,833 | − 10,973 | − 27,250 | |
| 1948 | Costs | 840,018 | 462,883 | 104,202 | |
| | Credits | 769,988 | 441,330 | 92,974 | |
| | | − 70,030 | − 21,553 | − 11,228 | |
| 1947 | Costs | 649,134 | 393,590 | 42,354 | |
| | Credits | 632,883 | 376,688 | 10.555 | |
| | | − 16,251 | − 16,902 | − 31,799 | |
| 1946 | Costs | 584,032 | 320,292 | | |
| | Credits | 456,152 | 283,927 | | |
| | | − 127,880 | − 36,364 | | |

On the debit side of an administration account are placed those costs which cannot be allocated to a specific job or contract, or, in other words, what is usually referred to as overhead. These costs include taxes, fringe benefits to the working force, holiday pay, vacation pay, jury pay, social security benefits, insurance benefits, hospitalization benefits, depreciation on all items in the plant, factory maintenance, power, light and heat, and wages and salaries paid to all employees whose efforts cannot be broken down in terms of man hours worked on a particular job or contract; in sum, all those expenditures which cannot feasibly be traced to work for a particular customer. On the credit side of the account the Company places the product which results from the multiplication of the cost of direct labor, that is labor which is attributed to and charged upon a specific contract, by a percentage figure which varies according to the type of direct labor involved and which represents the percentage which the Company has ascertained through experience will, when multiplied by normal direct labor costs, result in a dollar amount which will balance or exceed the debit or cost side of the administration account. Each customer is charged not only for the cost of direct labor on the particular job but also for that part of the credit sum in the administration account which is traceable to work done for him. That is, the customer pays the product of direct labor costs on his job multiplied by the appropriate percentage figure, in addition to paying for the direct labor itself. If everything works out properly, the Company should be taking in from its customers all or almost all of that which it pays out for overhead. The Christmas bonuses to the employees covered by each administration account is part of the overhead and is listed on the debit side of the ledger.

The Company maintains, the Board assumed, and we therefore do not question that when an appreciable loss shows on the administration account, something is radically wrong with the plant's productivity and efficiency. This is true if, as the Company claims, the normal cost of direct labor multiplied by the appropriate percentage figure approximates the total expenditures for overhead or, in other words, the debit side of the administration account.[3] For when direct labor falls off the costs thereof are lessened, and the multiplicand in the mathematical calculation used to determine the amount on the credit side of the account becomes smaller. The multiplier—the arbitrary percentage figure—does not become larger proportional to the decrease in direct labor costs, and therefore the product is lower than it would have been had direct labor costs remained at the higher, "normal" level.

The Company also looks to the fifth factor which the evidence shows is something more than the description by which it is identified. Continuity of work effort or work relationship includes not

---

3. We have some difficulty fitting together on the basis of information imparted by the record before us the theoretical operation of an administration account and the figures appearing in the Summary of Administration Results set out at note 2, supra. The Summary shows that both the cost and the credit totals for each account almost invariably increased with each succeeding year. Yet there is no evidence demonstrating that the growth in expenses for overhead was at all proportional to a rise in direct labor costs, that direct labor costs were artificially raised so that the credit side of an account could keep pace with the upward spiral on the cost side, or that the Company's "appropriate" percentage figure was determined in accordance with estimated overhead at each particular plant for the year in question. This last idea seems most plausible, but all the evidence shows on this point is that the appropriate percentage figure was learned by the Company through experience and varied from job to job and from plant to plant. In any event, since the Board's decision apparently accepts the notion that in theory the imbalance in an administration account indicates low productivity on the part of those employees whose direct labor costs are used to figure the credit total, we shall proceed upon the same hypothesis.

only the continued operation of each individual plant but the forecast for the plant's continued operation and profitability for the future. The continuity of work effort is therefore affected by the economic health of the country, by the economic well-being of the area where the plant is located and by the trend in both the business of the Company as a whole and the business of the individual plant. Much depends upon the continuity of the jobs and contracts available to a particular plant in its own location.

In applying this formula in 1957, the Company contends that analysis of factors 1 and 2 demonstrated that income from all plants and installations was sufficient to justify the granting of a bonus at Christmas of that year. The profit from the Santa Clara plant in 1957 was also exceedingly good. The Company claims that it decided to withhold the bonus from the production and maintenance workers at Santa Clara because of factors 4 and 5. The administration account at Santa Clara for 1957 showed an appreciable excess of costs over credits, indicating a loss in productivity among the production and maintenance workers, who, it seems, were the only employees whose direct labor costs went into the calculation of the credits in the administration account of the Santa Clara plant.[4] The Company further claims that the poor productivity of the production and maintenance workers at Santa Clara determined pursuant to factor 4 did not conclude the bonus issue. The last factor, continuity of work effort, was

also examined and was found to militate against giving a bonus to those at Santa Clara whose productivity was wanting. Not only was the continuity of effort at Santa Clara disrupted by the strike but recession was upon the nation, the collective bargaining contract between the Company and the Steelworkers was to be reopened in its entirety for negotiations in 1958, a situation pregnant with the possibility of troubles for the Company, and the business prospects for the Santa Clara plant, located as it was in an agricultural area, were purportedly foreboding. In consequence, the production and maintenance men there were denied a Christmas bonus in 1957.

This, in theory, is how the Five Factor Formula works and how, according to petitioner and the Trial Examiner, the decision to deny the 1957 bonus to the production and maintenance unit at Santa Clara was reached. For purposes of dealing with the second ground upon which the Board predicated its conclusion that the Company had violated § 8(a) (1) and (3) of the Act—that the application in 1957 of the Five Factor Formula even as it works in theory is sufficient without more to establish an intent on the part of the Company to interfere with and to discourage protected activity—we assume arguendo that the formula was used as petitioner claims. Although the workings of the formula seem involved, we think they can be boiled down to one essential consideration, at least insofar as 1957 was concerned. The *sine qua non* for the denial of the bonus to the

4. In addition to the production and maintenance workers, there were at Santa Clara approximately 100 other employees of the Company; accountants, sales directors, construction people, administrative and clerical employees, a group of men from a tool house directly connected with construction, a few watchmen and a gardener. All of these other employees received a 1957 Christmas bonus; however, none of their direct labor costs were used to compile the credit figure in the Santa Clara administration account. There was sketchy testimony to the effect that the labor of some of these other employees

figured in another administration account, but the account itself was never brought into evidence. All the record shows is that the direct labor of the production and maintenance men was the sum total of that direct labor the costs of which were used in "the" Santa Clara administration account. See Summary of Administration Results at note 2, supra. Consequently, as far as productivity was concerned, the imbalance in the Santa Clara account for 1957 is indicative only of the work of the production and maintenance employees.

Santa Clara production and maintenance workers in 1957 was clearly their failure to achieve sufficient productivity to satisfy the demands of the fourth factor in the Company's formula. The considerations embodied in the fifth factor may well have clinched the denial of the bonus, but without the application of the fourth factor, the yearly gift clearly would not have been withheld.[5] Accordingly, we feel justified in distilling the Company's argument, in accord with its brief on appeal, to the proposition that bonuses were denied the Santa Clara workers because, as shown by factor 4, they failed to achieve a sufficiently high level of group productivity,[6] and that to award and encourage high group productivity is a prerogative of management and a legitimate business pursuit which does not violate the act. The Board's position, on the other hand, is that since group productivity must always be affected by a prolonged strike, and was so affected to the detriment both of the Santa Clara strikers in 1957 and the Pittsburgh strikers in 1951, the discrimination called for by the Five Factor Formula in 1957 was based upon engagement in protected activities. Such discrimination leads naturally to the foreseeable consequence that the protected activity is interfered with and discouraged, and, pursuant to the Radio Officers' decision, the discrimination itself is thereby sufficient to establish the unlawful intent of the Company.

Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 was a consolidated disposition of three cases, among which was N. L. R. B. v. Gaynor News Co., reported below at 2 Cir., 1952, 197 F.2d 719. In that case the Board had held that the News Company had violated § 8(a) (1) and (3) of the Act by contractually granting retroactive wage increases and gratuitously awarding vacation payments to its employees who were union members while refusing both the contractual and gratuitous benefits to those of its employees who were not union members. Both union and non-union employees comprised a single bargaining unit for which the union was bargaining representative. The union had entered into a contract with the company providing that in the event the parties negotiated a new contract, the wage rates set out therein would be deemed retroactive for a period of three months; the benefits of such retroactivity, however, were to be given only to union members. Subsequently, a new contract was entered into, and in accord with its agreement with the union, the employer made lump-sum payments to its union employees in the amount of the differential between the old and the new wage rates for the three months' retroactive period. In addition to fulfilling this contractual obligation, the company gratuitously awarded its union employees added vacation benefits for the same retroactive period. The company's

5. That the fifth factor could not have been the decisive consideration in withholding the bonus to the production and maintenance workers is borne out by the fact that the gardener and watchmen at Santa Clara did receive a 1957 Christmas bonus. Although the imbalance in the Santa Clara administration account did not show inefficiency on their part, see note 4, supra, the gardener and the watchmen surely cannot be deemed to have contributed their efforts to the entire West Coast operation of the Company rather than to the Santa Clara plant, which they watched and gardened. If, under the fifth factor, prospects were bad for Santa Clara, yet good for the West Coast as a whole, prospects for the watch-men and the gardener would be bad—although perhaps good for other employees at Santa Clara whose efforts were devoted to the broader, West Coast operation. Thus, if the fifth factor were governing, the gardener and the watchmen would not have received a bonus. But they did.

6. The productivity which the administration account in theory measures is the group productivity of those whose direct labor costs are used to compile the credit total. The account is blind insofar as direct labor costs for each individual worker are concerned, and an imbalance indicates nothing in regard to the work of a particular employee.

non-union employees received neither the lump-sum payments nor the vacation benefits realized by the union members. There was no evidence of a motivation on the part of the employer to encourage union membership. Indeed, there was a great deal of evidence tending to show that the union pressured the employer into acting contrary to its own predilection. See 347 U.S. at pages 34–38, 74 S.Ct. at pages 332–334; Note, 42 Geo.L.J. 565 (1954).

With these facts in mind, the Court set out to examine the significance and proof of an employer's motive for the purposes of finding a § 8(a) (3) violation. First, the Court reaffirmed the proposition that the employer's purpose, intent or motive in indulging in discriminatory activity is controlling upon the question of a § 8(a) (3) violation. Id., 347 U.S. at pages 42–44, 74 S.Ct. at pages 336–337. Specific evidence of this intent, however, is not essential in all cases; it was not essential in Gaynor. Specific proof of intent, said the Court, is unnecessary where employer conduct inherently encourages or discourages union membership, for a man is held to intend the foreseeable consequences of his conduct. Where a natural consequence of an employer's discrimination is encouragement or discouragement of union membership, his protestation that he did not intend to encourage or discourage must be unavailing. If the Board finds that encouragement or discouragement will result, the unlawful intent of the employer is sufficiently established. Despite this broad language the Court clearly chose to limit the Board's ability to

infer unlawful intent from a showing of discrimination and the foreseeable results thereof to those situations where the discrimination is based solely upon union membership or union activity.[7] Such discrimination, that is, discrimination based solely on union membership, was exercised in the Gaynor case, and, said the Court, since a natural, foreseeable consequence of the company's activity was the encouragement of membership in the favored union, both encouragement and intent to encourage were established. Id., 347 U.S. at pages 44–46, 74 S.Ct. at pages 337–338. The Court then proceeded to hold that the contract obligating the company to discriminate in favor of the union was invalid and no defense to those unfair labor practice charges emanating from the discriminatory, lump-sum, retroactive wage payments to union members. As far as the employer's discrimination in regard to the gratuitous vacation benefits was concerned, the contract was apparently deemed irrelevant. Id., 347 U.S. at pages 46–48, 74 S.Ct. at pages 338–339.

■■ The conclusive presumption of intent set out in Radio Officers' is dependent upon two prerequisites.[8] First, the encouragement or discouragement of union membership must be a natural and foreseeable consequence of the employer's discrimination. And second, the discrimination itself *must* be based solely upon the criterion of union membership. This second prerequisite is, we think, of the utmost importance. For if every discriminatory action taken by an employer which could foreseeably result in the

---

7. Radio Officers' reaffirms the interpretation of "union membership" as encompassing participation in legitimate union activities. 347 U.S. at pages 39–40, 74 S.Ct. at page 335. To avoid undue verbosity we will use the phrases "union membership," "union activity" and "protected activity" interchangeably in this opinion.

8. Mr. Justice Frankfurter, concurring in Radio Officers' suggests that the inference of intent allowed by the Court is rebuttable and that the Court's opinion and his concurrence are not in disagree-

ment. 347 U.S. at pages 55–57, 74 S.Ct. at pages 343–344. While this may well be a consummation devoutly to be wished, the language of the majority opinion refutes the idea that the inference of intent raised by discrimination solely on the basis of union activity is rebuttable. For the Court said, "[A]n employer's protestation that he did not intend to encourage or discourage *must* be unavailing where a natural consequence of his action was such encouragement or discouragement." Id., 347 U.S. at page 45, 74 S.Ct. at page 338. The emphasis is ours.

encouragement or discouragement of union membership were proscribed by the Act, very few of the legitimate prerogatives of management could survive the flood of unfair labor practice charges. That the Act is not designed to produce such a result is evidenced by the amendment to § 10(c), 29 U.S.C.A. § 160(c), contained in the Taft-Hartley law, to wit, that the Board shall not require the reinstatement of any employee who has been suspended or discharged for "cause." As Professor Cox has noted, the amendment to § 10(c) did not really alter the meaning ascribed to the discrimination provisions from the very beginning. The Act has always permitted the employer to infringe on employees' rights when the infringement is motivated by a desire to protect rights which are legitimately the employer's. See Cox, Some Aspects of the Labor Management Act, 1947, 61 Harv.L.Rev. 1, 20–21 (1947). Thus, even though a natural foreseeable consequence of employer discrimination might be the discouragement of union activity, such discrimination is not unlawful unless actuated by an intent to achieve the foreseeable consequence rather than by a desire to carry out a legitimate business function. Radio Officers' limits rather than contradicts this basic proposition.

Radio Officers' renders the true intent of the employer irrelevant for all practical purposes *only* in situations where the employer's discrimination is based solely on union membership or activity. In those cases, the inference which the Board is permitted to draw operates in effect to eliminate the requirement that the General Counsel show an actual intent to encourage or discourage union membership. Radio Officers' thus propounds an exception to the usual "true intent" interpretation of § 8(a) (3), an exception born of the need to prevent an employer from indulging in discriminatory action at the threatful behest of an aggressive union while insulating himself from unfair labor practice charges by claiming in all truth that his discrimination was motivated not by an intent to encourage or discourage union membership, but by a desire to avoid the financial travail attendant upon labor strife. Radio Officers' is obviously directed at and effectively curbs the use of economic coercion by unions to effectuate employer discrimination, an abuse which otherwise might have gone temporarily unchecked under the Act. By eliminating the necessity to show unlawful intent where the employer discriminates solely on the basis of union membership, Radio Officers' precluded under any circumstances the most obvious kind of discrimination provoked by unions and the kind of discrimination which had been brought about by union pressure in all three of the appeals there consolidated by the Court.[9] When criteria other than union membership or activity are used as the basis for an employer's discrimination, the exceptional rule of Radio Officers' does not apply since the kind of discrimination which impelled the rule is absent. It is then up to the Board to predicate a conclusion of unlawful intent upon more specific evidence; a showing of the discriminatory treatment plus its natural and foreseeable consequences will not suffice.[10] In such cases, unlike Radio Officers', the employer claims that he dis-

---

9. We do not mean to say that Radio Officers' applies only in cases where union pressure is discernible; it applies in all cases where the employer's discrimination is based *solely* on union activity. We mean only to suggest, although perhaps it is not incumbent upon us to rationalize a Supreme Court decision, that the *raison d'etre* for Radio Officers' is the necessity as a matter of policy to prevent employer discrimination at the instigation of an ambitious union.

10. "But if [the employer's] criterion is, for example, individual employee efficiency or seniority, then something more [than the discrimination] would be necessary for showing an unfair labor practice." N. L. R. B. v. Richards, 3 Cir., 1959, 265 F.2d 855, 860. In the Richards case, Radio Officers' was applied; the discrimination was based solely on union membership.

criminated among his employees not because of their union activities but because of business reasons having nothing to do with labor relations, reasons such as good and bad work, good and bad attendance records, long and short terms of service and the like. See Bituminous Material & Supply Co. v. N. L. R. B., 8 Cir., 1960, 281 F.2d 365; N. L. R. B. v. Sebastopol Apple Growers Union, 9 Cir., 1959, 269 F.2d 705; N. L. R. B. v. Ford Radio & Mica Corp., 2 Cir., 1958, 258 F. 2d 457.

In the instant case—we are still assuming that the Five Factor Formula was applied as claimed—the Company did not discriminate against the Santa Clara strikers solely because they struck. Indeed, if the Company's argument was that it discriminated solely on the basis of the strike, but didn't intend to discourage union activity, we would have an entirely different situation, one in which the sole criterion for discrimination would be protected union activity. Here, however, the employer has discriminated *on the basis of group productivity*, not participation in a prolonged strike. The difficulty in the case is that the group's productivity, an aspect of business which management could seemingly reward and encourage, is foreseeably dependent and, the evidence indicates, actually was dependent upon the lack of a prolonged strike. In other words, group productivity will almost always rise and fall in proportion to participation by the group in prolonged walkouts; the facts in the instant case exemplify the generalization. And there is a difference between this situation and one where the basis of the employer's discrimination has nothing whatever to do with protected activity. When an employer discharges a union organizer for kleptomania or disturbing women employees, the purported cause of discharge has no relation at all to protected activity, while in the present case the alleged cause of the denial of the

bonus, lack of group productivity, is the direct result of participation in protected activity. In seeking to enlist the assistance of Radio Officers', the Board equated diminished group productivity with participation in a prolonged strike and concluded that discrimination on the basis of lower group productivity was in this case no different from discrimination on the basis of striking, a protected activity. This in effect means that under Radio Officers' an employer cannot use the lack of group productivity as a criterion for withholding a bonus when such a lack is caused by the group's engagement in a lengthy strike.

We disagree.

That protected union activity is the direct cause of a business condition upon which an employer actually predicates discrimination among his employees does not mean that the basis for discrimination is the protected union activity. An employer may hire permanent replacements for economic strikers even though the business condition—a lack of manpower—which impels the employer to act was directly caused by the strike. N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381. Discussion in Olin Mathieson Chemical Corp. v. N. L. R. B., 4 Cir., 1956, 232 F.2d 158, affirmed per curiam, 1957, 352 U.S. 1020, 77 S.Ct. 587, 1 L.Ed. 2d 562 and in N. L. R. B. v. California Date Growers Association, 9 Cir., 1958, 259 F.2d 587, indicates that when in order to obtain replacements for economic strikers it is necessary for an employer to promise seniority to the replacements, the denial of seniority status to those strikers who are reinstated is not an unfair labor practice, although the business condition which actuated the employer to deny seniority status to reinstated strikers was directly caused by the strike itself.[11] And in Chauffeurs, Teamsters and Helpers General Local 200, International Brotherhood of Teamsters v. N. L.

---

11. To the same effect see N. L. R. B. v. Potlatch Forest, Inc., 9 Cir., 1951, 189 F.2d 82, decided prior to Radio Officers'.

The grounds upon which the later cases distinguished or disagreed with Potlatch do not pertain to the present problem.

R. B., 7 Cir., 1956, 233 F.2d 233, 238, the court approved a conclusion of the Board which held that an employer had not committed an unfair labor practice by discharging an employee because the demand for his job had ceased, even though the job was rendered unnecessary by the employee's own picketing. The picketing, a protected union activity, had caused business to drop off with the result that the employer no longer had any need for the job which the employee had been doing. See Atlas Storage Division, 112 N.L.R.B. 1175, 1195 (1955).

In all the cases mentioned above the business condition upon which the employer predicated his discriminatory action was the direct result of participation in protected union activity by those employees who were discriminated against, yet Radio Officers' was not applied; the employer's true intent was looked into. We think the instant case must be treated similarly. There is surely sufficient evidence from which the Board could conclude as it did that if the Company used the Five Factor Formula, the lack of group productivity on the part of the production and maintenance workers at Santa Clara was the cause of their failure to receive a Christmas bonus in 1957. There was also sufficient evidence from which the Board could infer that the poor productivity of the Santa Clara group was caused by their participation in a prolonged strike during the year in question. The strike may well have caused the business condition—poor productivity—which the employer used as the criterion for its determination to withhold the bonus, but the protected union activity was not in itself the basis of the employer's discrimination. Consequently, Radio Officers' does not apply.[12] To enforce the Board's order we must find in the record substantial evidence of the motive or intent which underlay the Company's action, evidence other than the discriminatory action and its foreseeable consequences.

This brings us to the first ground upon which the Board predicated its conclusion that petitioner had violated §§ 8(a)(1) and (3) of the Act: that Pittsburgh-Des Moines as a general rule did not adhere to the Five Factor Formula but rather gave bonuses to all of its employees or to none of them and that the denial of the 1957 bonus to the strikers at Santa Clara, like the denial of the 1951 bonus to the strikers at Pittsburgh, were exceptions to the general practice, exceptions designed to penalize employees who participated in prolonged walkouts.

In determining that petitioner's general practice in regard to the yearly Christmas bonus was to give to all or to give to none, the Board relied upon two strands of evidence. First, it apparently considered that the history of petitioner's yuletide gifts implied such a practice. To recap the pertinent facts set out previously, all employees received bonuses every year since 1946, except in 1951, when the Pittsburgh strikers who had stayed out for 46 working days got no gift, in 1955, when the Fresno employees, who had been working for Pittsburgh-Des Moines only since August of that year, were left out, in 1956, when no employees received a gift, and in 1957, when the Santa Clara strikers were denied a bonus. Omitting the self-explanatory denial of a bonus to the Fresno workers in 1955, we cannot deny that the

12. In view of our conclusion that Radio Officers' is inapplicable in the present case because the discrimination here was not based solely upon union membership, we consider it unnecessary to examine the other reasons urged by petitioner in support of its inapplicability argument. As to the possible effect of the contractual negotiations, see note 1, supra, between the Company and the Steelworkers Union at Santa Clara, see N. L. R. B. v. Nash-Finch Co., 8 Cir., 1954, 211 F.2d 622, 45 A.L.R.2d 683; Intermountain Equipment Co. v. N. L. R. B., 9 Cir., 1956, 239 F.2d 480. As to the possible effect of the existence of multiple bargaining units among the Company's employees, compare Anheuser-Busch, Inc., 112 N.L.R.B. 686 (1955) and Speidel Corp., 120 N.L.R.B. 733 (1958) with Crosby Chemicals, Inc., 121 N.L.R.B. 412 (1958).

Company did in fact give a bonus either to all or to none of its employees except on the two occasions when a group of workers had participated in a prolonged strike. We think this fact is hardly sufficient, however, from which to draw the inference that the idea of all or nothing constituted the Company's general practice. Surely the Board could not infer from the firing of union sympathizers over the years that an employer followed a general practice of getting rid of unionists if the employer could show that the work of every man discharged was exceedingly bad. Some further evidence would be necessary, and we think it is also necessary in the instant case. Here the Company can and has explained each of its bonus decisions since 1946 on the basis of the Five Factor Formula.[13] The Board cannot simply assume that because the Christmas gifts can also be explained by attributing another system to the Company, a system which includes unlawful exceptions, such an unlawful system was utilized. We hold that the Board could not reasonably have inferred, as it did, from the history of the Company's giving at Christmas time, that petitioner had followed a general practice of rewarding all of its employees or none of them. In the absence of other, indicative evidence, the inference is wholly unjustified. See N. L. R. B. v. Kaiser Aluminum & Chemical Corp., 9 Cir., 1954, 217 F.2d 366, 368.

The Board purportedly found additional evidence of the Company's general practice in the testimony of witnesses for the union who said that Mr. Fegtly, the man in charge of Pittsburgh-Des Moines' West Coast operations, had told them, while explaining why the Santa Clara workers did not receive a Christmas bonus in 1956, that the Company's practice was to give to all or to none and that although the Santa Clara employees did exceptionally good work in 1956, since the overall earnings at other plants were not sufficient to warrant a bonus, nobody was going to get one. At the hearing before the Trial Examiner Fegtly denied making any such statement concerning the Company's general practice in awarding Christmas bonuses, and stated that the Company always used the Five Factor Formula. The Trial Examiner credited Fegtly in full and disbelieved the witnesses for the union, who testified to the words which Fegtly denied. The Board, although it did not hear the witnesses and could not have observed their demeanor nor judged their veracity at first hand, reversed the Trial Examiner on his findings of credibility.

■ We have recently had occasion to reassert that credibility is peculiarly the province of the Trial Examiner and that a reviewing court should not disturb his findings on that score unless the testimony which he credited was hopelessly or inherently incredible. N. L. R. B. v.

13. The Company's witness, Thomas G. Morris, testified that the bonuses to the Pittsburgh production and maintenance workers in 1951 and to their Santa Clara counterparts in 1957 were denied because of low group productivity as shown by the imbalance in the pertinent administration account for the year in question. See note 2, supra. The failure to give a bonus to anybody in 1956 is attributed to factors 1 and 2; the Company's overall earnings were insufficient. In 1950 and 1953 the administration loss at the Pittsburgh plant was higher than it was in 1951 when the bonus was withheld. Morris testified that the 1953 bonus was given at Pittsburgh because the Company anticipated that the administration results there would greatly improve in the next year; in other words, the outlook under factor 5 was good. At Santa Clara in 1957, the factor 5 outlook was dim. As far as the 1950 bonus at Pittsburgh is concerned, Morris testified that the gift was given despite low productivity because the Company had experienced a year of unusual profit from all of its facilities. Yet the General Counsel's evidence tended to show that 1957 was also a year of great profit for Pittsburgh-Des Moines. Indeed, the failure of the Company to explain why 1950 at Pittsburgh was different from 1957 at Santa Clara— perhaps factor 5 again—is in our view the single, specific aspect of the case which could indicate an unlawful motive. On the basis of the record as a whole, however, this indication is overwhelmed by credible evidence that the Company did not intend to penalize strikers.

International Longshoremen's and Warehousemen's Union, Local No. 10, 9 Cir., 283 F.2d 558. The Board, possessing an expertise which a reviewing court does not have, is not similarly restricted. Nonetheless, "we are not to be reluctant to insist that an examiner's findings on veracity must not be overruled without a very substantial preponderance in the testimony as recorded." N. L. R. B. v. Universal Camera Corp., 2 Cir., 1951, 190 F.2d 429, 430. Nor should the Board be permitted either to draw unwarranted inferences to reverse a finding of credibility made by the Trial Examiner or to discard positive findings of credence in favor of inferences drawn from tenuous circumstances. N. L. R. B. v. Pyne Molding Corp., 2 Cir., 1955, 226 F.2d 818, 819; Boeing Airplane Co. v. N. L. R. B., 9 Cir., 1954, 217 F.2d 369, 376. We think this is exactly what the Board has done in the present case by refusing to accept the Trial Examiner's belief in Fegtly's testimony yet believing the testimony of others whom the Trial Examiner refused to credit. The reversal of the Trial Examiner's findings was based on the tenuous inference drawn from the history of petitioner's Christmas gifts and from the sketchy evidence discussed below. Viewing the evidence "in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view," we are convinced that the finding of the Board that the Company's general practice in giving Christmas bonuses was to reward all of its employees or none of them is unsupported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; Morrison-Knudsen Co. v. N. L. R. B., 9 Cir., 1960, 276 F.2d 63, 73.

The other evidence relied on by the Board in reaching its conclusion that the denial of the 1957 Christmas bonus to the production and maintenance workers at Santa Clara was motivated by a desire to penalize them for engaging in a prolonged strike is equally flimsy. First, the Board noted that the resolution of the Company's Board of Directors which withheld the bonus did so in regard to the "striking employees" at the Santa Clara plant. That the resolution was put in these terms does not in our opinion afford a proper basis for inferring that the purpose of the denial was to penalize the strikers. Again, we think the inference drawn by the Board is completely arbitrary; motivation is not to be inferred from terms of designation. Freudian theory is not yet an adequate substitute for the required evidence of intent. The Board also relied upon a statement made by Robert Barrett, the Company's personnel manager at Santa Clara, to the effect that the striking employees had pretty well fixed the situation and that he, Barrett, could not see why the Company would give money away to men who had caused it to suffer a substantial loss. The record shows that Barrett had come to work with petitioner only months before he made the statement outlined above, that he did not know how the determination to give Christmas bonuses was made, that nobody in the Company had ever told him that the denial of the 1957 bonus to the Santa Clara strikers was to penalize them for striking, and that whatever he said was only his own personal opinion. To infer the motive of the Company from Barrett's statement is to indulge in out-and-out conjecture. Barrett's admission that he had no idea of how the Company made its bonus decisions totally divorces his opinion of the reasons underlying the withholding of the 1957 bonus from the actual reasons upon which the Company acted. Consequently, no inference of motive can be drawn from what Barrett said.

Lastly, the Board relied upon a statement made by Fegtly: "The lengthy strike at Santa Clara in 1957 obviously affected the earnings of the Santa Clara plant for that year. It was determined that the hourly employees at the other plants should not be penalized." From this the Board inferred once again that

the Santa Clara production and maintenance employees were being punished for striking. The inference here is not quite so farfetched as the inferences drawn by the Board from the evidence previously discussed. However, a statement *in vacuo* is one thing; looked at in context, it is another. Fegtly's testimony was to a large extent an elucidation of the Company's present position, that the denial of the bonus to the Santa Clara strikers in 1957 was due to the application of the Five Factor Formula, especially factor 4, which measured group productivity. The strike of necessity lowered this productivity at Santa Clara while the productivity at the other plants remained high since no other prolonged strike occurred during the year. The Board, however, seized upon Fegtly's use of the word "penalized" to ascribe to his statement a meaning which is refuted by page after page of his testimony at the hearing. On the record as a whole, the inference drawn by the Board is unjustified.

■ In sum, on the basis of a number of unwarranted inferences the Board overturned the credibility findings of the Trial Examiner and concluded that petitioner's motive in denying a bonus to the production and maintenance workers at Santa Clara was to penalize them for engaging in a prolonged strike. The record in its entirety is too weak to sustain such a position. We hold that the evidence to support the decision of the Board that the Company was motivated by a desire to punish strikers and thus to interfere with and discourage protected activity is fatally insubstantial, that the record before us "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456. In the absence of sufficient evidence to show that the true intent of the employer was to interfere with or discourage protected activity, the Board's order cannot stand. See N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893; Associated Press v. N. L. R. B., 1937, 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953; Radio Officers' Union, etc. v. N. L. R. B., 1954, 347 U.S. 17, 42–44, 74 S.Ct. 323, 98 L.Ed. 455.

■ This is not an easy case. We are fully aware that the vacillations of group productivity are predictably so closely related to participation by the group in protected activity that an extension of the Radio Officers' rule may well be thought appropriate from a policy viewpoint. Indeed, the fifth factor in the Company's formula is so broad and flexible that it fairly cries out for abuse, abuse which could conceivably insure that only the low group productivity caused by engagement in prolonged strikes would result in the denial of bonuses. Nonetheless, we do not think the record in the instant case justifies such a step. The evidence showed that petitioner had initiated the administration account procedure in 1936, only one year after the passing of the Wagner Act and before the first Labor Act cases were decided by the Supreme Court. This fact, in our view, minimizes the possibility that the formula was devised as a coverup for unlawful discrimination. Moreover, the evidence before the Board clearly failed to establish that the formula was in fact so utilized or that the formula was not used at all. An employer is not guilty of unfair labor practices simply because his activity can all too easily be perverted into a system of unlawful discrimination. The unlawful act itself, not proximity to it, must be shown.

The petition to set aside the order of the Board here reviewed is granted. The order is set aside.