QUALITY CASTINGS COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 15223.

United States Court of Appeals
Sixth Circuit.

Dec. 7, 1963.

---

Charles R. Iden, Akron, Ohio, Brouse, McDowell, May, Bierce & Wortman, Akron, Ohio, on brief, for petitioner.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Allen I. Mendelsohn, Attorney, N. L. R. B., Washington, D. C., on brief, for respondent.

Before O'SULLIVAN, Circuit Judge, and KALBFLEISCH and PECK, District Judges.

KALBFLEISCH, District Judge.

The Quality Castings Company has petitioned this Court to review and set aside an order of the National Labor Relations Board issued against petitioner on November 16, 1962. In its answer the Board has requested that the order be enforced in full. The order resulted from an alleged unfair labor practice based upon petitioner's failure to make profit-sharing payments to 64 former employees who had engaged in a prolonged strike. The Board's decision and order are reported at 139 N.L.R.B. 66.

The relevant statutory provisions are Section 7 of the National Labor Relations Act, 29 U.S.C.A., Section 157, and Section 8, Subsections (a) (1) and (a) (3) of the Act, 29 U.S.C.A., Section 158(a) (1) and (3).

Since 1945 petitioner had provided a profit-sharing plan for all of its approximately 250 employees. With the exception of the years 1949 and 1950, petitioner always made these profit-sharing payments on a quarterly basis. There was the possibility of a fifth payment each year in the event the profit estimates for the quarterly payments proved lower than the actual profits calculated at the end of the year. In 1949 and 1950 petitioner made only three payments annually, rather than four.

An employee's share of the payments under the plan was calculated upon the three separate factors of seniority, aptitude and absenteeism, each of which represented an individual pool. Petitioner put a sum of money in each pool every quarter, and the three pools were added together to arrive at the total quarterly distribution. To share in the seniority pool an employee must have worked one year, on the expiration of which he would receive 10% of a share. For each successive year the employee's percentage of a share was increased by 10%, until the expiration of ten years when he received a full share. The aptitude pool was distributed on the basis of a foreman's rating. The attendance pool was distributed on the basis of a percentage of attendance. Thus, an employee who missed six working days out of a sixty-day period would miss one-tenth and would receive 90% of a full share in the attendance pool. Petitioner emphasized the importance of attendance and, as a result, the

percentage deduction for absenteeism applied as well to each of the other two pools in which the particular employee participated. Additionally, the plan provided that absence without excuse for three or more consecutive days, or for a total of ten days during any quarterly period, would disqualify an employee from sharing in any of the pools for that particular period. Petitioner's President, Mr. Yonto, testified that the plan emphasized attendance because the Company had found regular attendance to be one of the most important factors contributing to its successful operation.

On September 11, 1959, the United Steel Workers of America was certified as the bargaining representative for petitioner's employees. Contract negotiations included a discussion of various proposals with respect to the profit-sharing plan. On October 30, 1959, petitioner posted a notice on the Company's bulletin board which reiterated its belief in the profit-sharing plan and its earnest desire to see the plan continue. However, the notice cautioned that until such time as the negotiations with the Union had been terminated the Company was uncertain whether any profit-sharing payments would be made for the last quarter of 1959 or any time thereafter.

Throughout the history of the plan, the Company had uniformly established the practice of posting upon the bulletin board every few days a new estimate of the amounts of money which were available at that time for profit sharing. On October 30, 1959, the same date upon which the Company gave notice of its doubts concerning the continuation of the plan, it stopped posting regular notices. On December 20, 1959, the Company did pay its regular fourth quarter profit-sharing distribution. On January 28, 1960, the Company again cautioned its employees that the continuation of profit-sharing payments was dependent upon the Union negotiations, and it made no further such payments until November of 1960.

The Company and the Union were unable to reach agreement upon a contract,

and on April 10, 1960, the employees went on strike. Shortly after this date the employees began returning to work in substantial numbers. The strike was officially terminated on May 19, 1960, by which time all but 64 of the approximately 250 employees had returned to work. These 64 employees who had not returned to work by May 19, 1960, were not rehired because of economic reasons. There has been no charge that the failure to rehire these employees in any way constituted an unfair labor practice.

On October 18, 1960, the Union was decertified as the bargaining representative of the Company's employees. On November 20, 1960, the Company, which had made no profit-sharing distributions since the distributions for the year 1959, announced that it would be able to make a profit distribution for the year 1960. Under the former procedure, there would have been three regular 1960 payments made by this date; however, no such payments had occurred.

Petitioner announced new rules governing its profit-sharing distributions at the time of its November 1960 announcement of the resumption of profit sharing. A sliding scale of payments was established, based upon the number of days an employee was absent from his job without excuse. Employees with three or fewer days of non-excused absence would receive a 100% share in the attendance pool. As to each participating employee this percentage decreased in proportion to the increase in the days of unexcused absence. The reduced percentage share in the attendance pool resulted in a reduction of the employee's share in the other pools as well. However, the important fact, for the purpose of this lawsuit, was that, as a basic qualification, no employee was entitled to participate in the plan who had not worked 50% of the scheduled work time during the preceding nine-month period of January through September. Scheduled work time included the period of the strike. This qualification requirement, which was adopted instead of the three-day consecutive or ten-day total non-excused absence dis-

qualification rule of the former plan, resulted in the 64 employees, who were not rehired after the strike, plus seven other employees whose status is unknown, failing to qualify to participate in the amended profit-sharing plan. It should be noted that the 50% requirement made no allowances for excused absences; that is, employees who failed to work 50% of the time, whether their work failure was excused or unexcused, were excluded from participating in the distribution.

The President of the Company testified that the petitioner modified the former rules concerning absences to avoid paying the entire pool to those few employees who returned to work prior to the end of the first three days of the strike. The Company was evidently of the opinion that only those employees who returned during the first three days would meet the eligibility requirements of the old plan, because the Company equated time on strike to time that was a nonexcused absence.

On these facts the Board, with two members dissenting, found that petitioner, by abandoning its old plan and promulgating its new form of profit distribution under rules which excluded the 64 strikers who did not return to work before the strike was terminated, and who were never rehired, had discriminated against these employees in a manner that foreseeably and necessarily discouraged participation in protected, concerted activities and, therefore, violated Section 8, Subsections (a) (3) and (a) (1) of the Act. Accordingly, without regard to petitioner's motive, the Board held that its actions violated the Act. However, in addition, the Board found that petitioner's true motive in devising the plan was to penalize the 64 strikers for having remained away from work until the strike was officially terminated. On this alternative ground the Board also concluded that petitioner violated Section 8, Subsections (a) (3) and (a) (1).

At the outset we are met by petitioner's contention that the unfair-labor-practice charge was not filed within six months of the alleged violation and the complaint was therefore barred. We agree with the Board that the unfair labor practice complained of was the failure to include the 64 employees in the profit-sharing plan when it was announced in November of 1960, and not the failure of the Company to make profit-sharing payments at earlier dates in that year. Therefore, the complaint alleging the unfair-labor-practice charge was filed within six months of the complained of action and this contention is without merit.

The Board contends that the failure to include these 64 employees in the eligibility requirements of the profit-sharing plan constituted a per se violation of the Act and was thus an unfair labor practice, irrespective of petitioner's motivation in formulating the plan. With this contention we cannot agree. It is true that under some circumstances the courts have held that certain actions are on their face so discriminatory, and that the foreseeable consequences of such discrimination are so clear, that the employer can be held to have anticipated those consequences and, therefore, specific proof of the employer's intent or motive is unnecessary. The Supreme Court specifically dealt with such situations in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N. L. R. B., 347 U.S. 17, 42, 45, 74 S.Ct. 323, 98 L.Ed. 455 (1954). There the Court said:

"The unfair labor practice is for an employer to encourage or discourage membership by means of discrimination. Thus this section does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited. Nor does this section outlaw discrimination in employment as such; only such discrimination as encourages or discourages membership in a labor organization is proscribed." (P. 42 of 347 U.S., p. 337 of 74 S.Ct., 98 L.Ed. 455.)

"Both the Board and the courts have recognized that proof of certain

types of discrimination satisfies the intent requirement. This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common-law rule that a man is held to intend the foreseeable consequences of his conduct." (P. 45 of 347 U.S., p. 338 of 74 S.Ct., 98 L.Ed. 455.)

However, in every case where the Supreme Court has held that a violation existed which made proof of motive or intent unnecessary, the action complained of has been clearly discriminatory on its face; that is, it has been openly and avowedly directed solely at a group of people who have participated, in one manner or another, in certain actions which are specifically protected, concerted activities within the meaning of the Act.

In Pittsburgh-Des Moines Steel Co. v. N. L. R. B., 284 F.2d 74, 82 (1960), the Ninth Circuit was faced with a problem strikingly similar to the one now before this Court. In this regard that Court said:

"The conclusive presumption of intent set out in Radio Officers' is dependent upon two prerequisites. First, the encouragement or discouragement of union membership must be a natural and foreseeable consequence of the employer's discrimination. And second, the discrimination itself *must* be based solely upon the criterion of union membership. This second prerequisite is, we think, of the utmost importance. For if every discriminatory action taken by an employer which could foreseeably result in the encouragement or discouragement of union membership were proscribed by the Act, very few of the legitimate prerogatives of management could survive the flood of unfair labor practice charges. * * *

"Radio Officers' renders the true intent of the employer irrelevant for all practical purposes *only* in situations where the employer's discrimination is based solely on union membership or activity. In those cases, the inference which the Board is permitted to draw operates in effect to eliminate the requirement that the General Counsel show an actual intent to encourage or discourage union membership. * * * When criteria other than union membership or activity are used as the basis for an employer's discrimination, the exceptional rule of Radio Officers' does not apply since the kind of discrimination which impelled the rule is absent. It is then up to the Board to predicate a conclusion of unlawful intent upon more specific evidence; a showing of the discriminatory treatment plus its natural and foreseeable consequences will not suffice. In such cases, unlike Radio Officers', the employer claims that he discriminated among his employees not because of their union activities but because of business reasons having nothing to do with labor relations, reasons such as good and bad work, good and bad attendance records, long and short terms of service and the like."

See also Lawson Milk Co. v. N. L. R. B., 317 F.2d 756 (6th Cir., 1963).

Justice Harlan, in his concurring opinion in Local 357, International Brotherhood of Teamsters Chauffeurs, Warehousemen & Helpers of America v. N. L. R. B., 365 U. S. 667, 679, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), commented upon the necessity of the Board's proving a respondent's motive or intent. In that opinion, which cites and approves the Pittsburgh-Des Moines Steel case, the Justice said:

"What in my view is wrong with the Board's position in these cases is that a mere showing of foreseeable encouragement of union status is not a sufficient basis for a finding of violation of the statute. It has long been recognized that an employer can make reasonable business decisions, unmotivated by an intent to discourage union membership or

protected concerted activities, although the foreseeable effect of these decisions may be to discourage what the act protects. For example, an employer may discharge an employee because he is not performing his work adequately, whether or not the employee happens to be a union organizer. * * * Yet a court could hardly reverse a Board finding that such firing would foreseeably tend to discourage union activity. Again, an employer can properly make the existence or amount of a year-end bonus depend upon the productivity of a unit of the plant, although this will foreseeably tend to discourage the protected activity of striking. Pittsburgh-Des Moines Steel v. N. L. R. B. [9 Cir.], 284 F.2d 74. * * *

"This Court's interpretation of the relevant statutory provisions has recognized that Congress did not mean to limit the range of either employer or union decision to those possible actions which had *no* foreseeable tendency to encourage or discourage union membership or concerted activities. In general, this Court has assumed that a finding of a violation of § 8(a) (3) or § 8(b) (2) requires an affirmative showing of a *motivation* of encouraging or discouraging union status or activity. * * * There have, to be sure, been exceptions to this requirement, but they have been narrow ones, usually analogous to the exceptions made to the requirements for a showing of discrimination in other contexts."

We are of the opinion that when, as in this case, an employer's action is not specifically directed against those who have engaged in protected types of union activity, but is rather directed at a group which is defined by other than union membership or activity criteria, and which clearly includes others who did not engage in the protected, concerted activities, the Board not only must prove discrimination but also it must prove the employer's motivation. There is

nothing in N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L. Ed.2d 308 (1963) which conflicts with this holding. As the Ninth Circuit said in Pittsburgh-Des Moines Steel Co. v. N. L. R. B., supra, 284 F.2d 84:

"Here, however, the employer has discriminated *on the basis of group productivity,* not participation in a prolonged strike. The difficulty in the case is that the group's productivity, an aspect of business which management could seemingly reward and encourage, is foreseeably dependent * * * upon the lack of a prolonged strike. In other words, group productivity will almost always rise and fall in proportion to participation by the group in prolonged walkouts; the facts in the instant case exemplify the generalization. * * * In seeking to enlist the assistance of Radio Officers', the Board equated diminished group productivity with participation in a prolonged strike and concluded that discrimination on the basis of lower group productivity was in this case no different from discrimination on the basis of striking, a protected activity. This in effect means that under Radio Officers' an employer cannot use the lack of group productivity as a criterion for withholding a bonus when such a lack is caused by the group's engagement in a lengthy strike.

"We disagree.

"That protected union activity is the direct cause of a business condition upon which an employer actually predicates discrimination among his employees does not mean that the basis for discrimination is the protected union activity."

In this case, however, the Board, in addition to its conclusion that the action complained of was a per se violation, making proof of motivation unnecessary, further found that the petitioner did intend to discriminate against these 64 strikers and that it was "discriminatorily motivated in formulating its plan to ex-

clude completely the 64 strikers. * * " We must therefore determine whether, upon this record, there is substantial evidence to support the Board's finding of motivation.

A. J. Yonto, petitioner's President, testified that if the Company had used its old plan in determining who would have been eligible for profit sharing payments,

> "there would have been only a few who would have gotten any profit. We didn't feel that was right. We wanted to be fair to everybody and a no-excuse day was a no-excuse day whether it was that it was because of the strike or whether it was in that whole period. * * * Because at the first three days we probably had 15 or 20 people in to work— * * * if we had stuck to the three-day, no-excuse—those people would have received the whole amount. * * * We didn't feel that was fair * * *."

All of the testimony in the case supports this assertion that petitioner instituted the new plan to avoid eliminating from all profit-sharing payments those employees who had participated in the strike for more than three days.

It is true that the revised plan provided that participating employees who were absent for more than three days had their payments reduced, and that the amount of this reduction depended upon the length of the absence. It is further true that for this purpose petitioner equated time spent on strike to an absence. Both the Board and its counsel have relied heavily upon these facts. However, this proportionate reduction in the amount of payments made is completely irrelevant to the issue of whether these 64 employees were discriminated against when the Company instituted the requirements that disqualified them from any participation in the plan. The only relevancy which this consideration could have would be upon the issue of petitioner's motivation. In that regard it can be used only as the basis for an inference that because petitioner did not choose to award profit-sharing payments to employees for periods of time when they had not worked, and thus had not helped create profits, it was motivated by an anti-Union bias. A far more valid inference is that the Company desired to share profits only with those employees who helped make them. In fact we think the Board itself rejected the suggested inference because in its order, although it required that these 64 be included in the profit sharing, it allowed a reduction in the amount of their payments proportionate to the time they had not worked, and for this purpose *the Board equated time on strike to non-worked time.*

In holding that petitioner's motivation was to discriminate agaisnt these 64 strikers, the Board relied heavily upon Mr. Yonto's affirmance of the following statement:

> " * * * this chart, then, was drafted so that individuals who remained away on strike for more than three days or whoever abandoned the strike and returned to work sometime before the May 19 termination date, were penalized to a certain extent, but not to the extent of losing their whole share in the profit-sharing plan * * *." (P. 12, App. to Respondent's Brief.)

In this regard the Board said:

> "The inference seems clear that Respondent's correlative intention was to eliminate completely those strikers who did not return to work before the May 19 termination date, i. e., the strikers here in question." (P. 33a, Petitioner's App.)

A pronounced weakness in the inference drawn by the Board is found in the form of the question from which the inference was drawn. The weakness is made more obvious when an examination is made of the other testimony which was elicited at the same time, and of the chart (P. 5b of App. to Respondent's Brief) referred to in the question. In reviewing the question and the answer upon which the Board relied we recog-

nize that it was part of an extended oral inquiry; however, the question contains more than one proposition. We cannot know to which proposition the witness was answering "That's right." To attach a critical inference, as the Board did, upon this question and answer concerning this chart was unwarranted. For one thing it is obvious that "this chart" is not an instrument which even remotely hints at spelling out the terms of the profit-sharing plan. General Counsel's Exhibit 12 is a simple graph, an office aid, by the use of which one may quickly ascertain the effect of absenteeism upon the share percentage to which any given employee would be entitled. It is a device which enables a viewer to see that an employee with a certain number of days of unexcused absence will have a corresponding percentage reduction in the profit-sharing benefits. We think it is nothing more.

■ Furthermore, while the Board is entitled to draw reasonable inferences from admitted facts (See Radio Officers' Union v. N. L. R. B., supra), the inference which the Board has drawn here is not valid. To say that because the 64 employees did not meet the eligibility requirements of the amended profit-sharing plan the Board was entitled to infer that petitioner did not intend to give them profit-sharing payments may be a valid inference. But to say, as the Board further assumes here, that because the petitioner did not intend to make profit-sharing payments to these 64 employees and to 7 others it is presumed to have been motivated by a desire to discriminate against these 64 because they had stayed on strike for the entire duration of the walkout is to equate foreseeability with motivation and thus read motivation out of the case—the very thing which we have held the Board cannot do.

We have considered the other facts which the Board believed established petitioner's anti-Union motivation, such as the fact that the plan was announced after petitioner could determine who would be affected by it, and find them to be without sufficient merit to support the Board's determination when the whole record is reviewed. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

An important consideration in determining whether petitioner was motivated by anti-Union bias is whether such a bias had manifested itself in other situations. Although this petitioner had experienced more than one year's labor unrest, starting with the certification of the Union, proceeding through the strike and the strike's failure, and concluding with the Union decertification, the only complaint of an unfair labor practice which was made was the one that is before us now.

A most important fact to be considered is that the 50% requirement was an eligibility requirement which was stated only in terms of time worked, which made no allowances for either excused or unexcused absences, and which made absolutely no reference to strike time, or to anything connected with the Union or with Union activity. Furthermore, this plan resulted not only in the disqualification of these 64 men who did not attempt to return to work until the strike was terminated, but also in the disqualification of seven other employees.

Just as the Ninth Circuit, in the Pittsburgh-Des Moines Steel case, held that year-end bonuses could be withheld if employees failed to produce sufficient work, we think petitioner was entitled to require a minimum amount of work and consequent profit creation before it permitted an employee to participate in profit sharing.

■ There being no substantial evidence to support the determination of the Board that petitioner was motivated by a desire to discriminate against these employees because of their continued participation in the strike, and this Court having held that a showing of such motivation is required before an unfair labor practice can be established in circumstances such as these, the Board's petition for enforcement of its order is denied and the order of the Board is set aside.