COOPERATIVA CAFETEROS DE PUERTO RICO, Plaintiff and Appellee, v. RAMÓN COLÓN TORRES and CARLOS M. MATOS, ETC., substituted by LUIS RIVERA SANTOS and AUGUSTO N. ACEVEDO, Defendants and Appellants.[1]

No. 12478. Decided December 21, 1961.

[1] At the hearing of the case Ramón Colón Torres was formally substituted by Luis Rivera Santos, as Secretary of Agriculture, and Carlos M. Matos by Augusto N. Acevedo, as Inspector of Cooperatives. Pursuant to the provisions of Act No. 4 of May 1, 1957, the functions of the Secretary of Agriculture and Commerce in connection with the Office of the Inspector of Cooperatives were transferred to the Cooperative Development Administration.

*Francisco Espinosa, Acting Secretary of Justice, J. B. Fernández Badillo, Solicitor General,* and *Edgar S. Belaval, Assistant Solicitor General,* for appellants. *Héctor González Blanes, S. L. Lagarde Garcés,* and *Francisco Parra Toro* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The Inspector of Cooperatives requested from "Cafeteros de Puerto Rico" an extensive report on the operations of said cooperative. The letter of the Inspector of Cooperatives appears as appendix to this opinion. "Cafeteros" prepared a document containing all the information requested, and its board of directors, at a first meeting, agreed to submit the report. At a subsequent meeting the directors reconsidered their former agreement and informed the Inspector of Cooperatives that they would not submit the report but that he could examine the document they had prepared containing all the information requested, and take note of whatever he deemed convenient. The Inspector did not accept and in-

formed "Cafeteros" that it should mail a copy of the report to his office. "Cafeteros" failed to do so and after 30 days from the date the Inspector requested that the report be mailed to him, he fined it $5 for each day of delay in sending the report, up to a maximum of fifteen days. 5 L.P.R.A. § 912. "Cafeteros" appealed from this decision to the Secretary of Agriculture but the latter refused jurisdiction. It then filed the present petition for a declaratory judgment.

The question for decision as stated in the complaint is "whether or not the report requested ... is of the nature and character of those referred to in § 16 of Act No. 291 of 1946 [5 L.P.R.A. § 896]."

The above-mentioned provision states thus:

"Each association organized under this Act shall prepare and make an annual report setting forth the following:

(1) Name of the association.

(2) Principal place of business.

(3) A general statement of its business operations during the fiscal year, showing the shares paid and the number of shareholders, if a capital-stock association, or the number of members and the amount of the admission quota, if a non-stock association.

(4) The volume of business with members and non-members.

(5) A detailed report of expenditures and receipts.

(6) Statement of condition at the close of operations.

(7) Any other information which the Inspector of Cooperatives...may deem necessary.

Copy of this report shall be sent to the Inspector of Cooperatives of Puerto Rico and to the Department of Cooperatives of the Agricultural Extension Service of the University of Puerto Rico, certified by the president and the secretary of the association.

When a cooperative association shall [fail], without good excuse, to render to the Inspector of Cooperatives on the due date thereof the annual report mentioned in this section, *or any other report requested by him...*"

Upon deciding the question the trial judge held that "the request of the Inspector of Cooperatives of Puerto Rico....

constituted an unreasonable exercise of his power to request special reports within the scope of § 16 of the Cooperative Act of Puerto Rico. An examination of the details contained in the aforesaid letter, together with the evidence presented during the trial, convinces us, in the first place, that *even though the report is pertinent for the purposes of an inspection of the Association's books by an agent of the defendant Inspector, the requesting of such a special report has no basis whatever from the standpoint of verification.* That is, if defendant's purpose was to carry out an investigation of the report which had been originally submitted by the plaintiff, no benefit would be derived in requesting the same person who submitted the original report to submit a detailed report on the same matter. The veracity granted to the first report had necessarily to be exactly as that given to the detailed report because it had been rendered by the same person. In the second place, the fact of insisting that the information requested be given in writing and sent to the defendant by mail—despite the fact that plaintiff offered to provide the Inspector with the means to check the same—made the requirement unreasonable. It tended to compel plaintiff to reveal business secrets and confidential information such as the name of foreign coffee buyers and production costs." (Italics ours.)

Before passing to consider the question presented in this appeal it is fitting to indicate that the Legislative Assembly has considered that cooperativism is permeated with great public interest. Hence, that upon approval of the General Cooperative Associations Act (Act No. 291 of April 9, 1946, 5 L.P.R.A. § 881 *et seq.*) it stated the following in the Statement of Motives:

"The practice of cooperative action in every aspect of our social and economic life, inspired in a philosophy of human renovation, should constitute one of the most valuable and effective instruments for the solution of the global problem of the Island. In the first place, it can contribute to greater pro-

duction of wealth as well as to a more equitable distribution thereof. In order to ensure, for example, increased purchasing power for the limited resources of our people, so that there may be a larger quantity of consumer goods available, as well as the enjoyment of more and better social and economic services, the purchase of articles for daily consumption and the rendering of the various services to the community should be organized, to the extent that circumstances will permit, in cooperative form."

Implementing this policy, cooperatives have received special treatment from the Legislative Assembly. They have received benefits and advantages not given to other entities. Exemption from all taxes on real and personal property up to an assessed valuation of one hundred thousand dollars ($100,000), Act No. 291 of 1946, § 26—5 L.P.R.A. § 906, income tax exemption, *id.* § 27, 5 L.P.R.A. § 907; exemption from payment of municipal license taxes with regard to the volume of business done with their members, Act No. 81 of June 20, 1955, 5 L.P.R.A. § 918; sale of government real property to cooperatives without call for bids, Act No. 97 of June 24, 1960, 5 L.P.R.A. § 925; among others. A strict supervision in charge of the Inspector of Cooperatives has been established by law in exchange for the advantages granted, since, as stated in the afore-mentioned Statement of Motives "The efforts made thus far for the organization of cooperatives in Puerto Rico have suffered from five serious defects, to wit: ... 3. Lack of an adequate inspection system, both as to the accounting methods employed, as well as to the fulfillment by cooperatives themselves of the principles underlying cooperativism."

Pursuant to the General Cooperative Associations Act of Puerto Rico, the Inspector of Cooperatives of Puerto Rico is the officer in charge of seeing that the provisions of the above-mentioned Act are complied with. Certain powers and regulations are imposed upon him—§ 19, 5 L.P.R.A. § 899—including the following:

"*a*. To require the board of directors of the cooperative to correct the irregularities pointed out by the Inspector, or to call an assembly of members in order that said assembly may do it.

"*b*. To call, in case the board of directors should refuse to do it, a special assembly of the members of the cooperative, in order to explain to said assembly the irregularities pointed out by the Inspector, for the purpose of having them corrected.

"*c*. Recommend to the Secretary of State the cancellation of the certificate of registration, when it is not possible to correct said irregularities."

In order to comply with such ample powers the Inspector has the authority to investigate and request reports from the cooperatives so that he may be in a position to determine whether irregularities have been committed and what they consist of. The Act establishes, as we have seen from § 16 copied above, that cooperatives shall submit an annual report setting forth the contents of the provisions of said section. It also provides that any other information required by the Inspector shall be submitted.

In addition to the former provision "The Inspector of Cooperatives is hereby authorized to audit and investigate the accounts, books, resolutions, transactions, properties, contracts, funds, investments, and any other matters and activities connected with the financial situation and the operation of cooperatives." Act No. 312 of May 13, 1949, § 2, 5 L.P.R.A. § 911. It is further provided that the Inspector of Cooperatives shall be authorized to collect from any cooperative whose volume of business exceeds $100,000, the total cost he may have incurred for the auditings or investigations made in connection with said cooperatives, *id.* § 3, 5 L.P.R.A. § 912.

■ Obviously the provisions of § 16 with respect to the annual report or additional reports and the one we have just mentioned, complement each other. The requirements of the first six subdivisions of § 16 clearly do not furnish sufficient information in all the cases so that the Inspector may duly

fulfill the commission entrusted him by the Act. For that reason the seventh subdivision provides that the cooperative shall furnish any other information which the Inspector may deem necessary and that the cooperative is compelled to submit any other information requested by the Inspector. These provisions are ample and all-embracing and authorize the demand for any information which the Inspector may deem pertinent, naturally, within the attributions conferred to him by the Act.

■ The provision which treats on the power to investigate applies to situations in which the Inspector is not in a position to determine, prior to the investigation, which information he is interested in. In such cases he makes the investigation. Now, if the Inspector, beforehand, is in a position to request a specific report, it is the duty of the cooperative to furnish it. The fact that the Inspector has authority to investigate does not imply that the cooperative may refuse to submit a report requested by the Inspector, invoking the provisions of the afore-cited § 16.

■ It is a well-settled rule in the case law that administrative bodies have ample powers to request information and investigate the organizations which the law authorizes them to regulate and supervise. Originally it had been held that administrative bodies could not direct fishing expeditions into the agencies they regulated, *Fed. Trade Comm. v. Amer. Tobacco Co.*, 264 U.S. 298 (1924), but since the decision of *United States v. Morton Salt Co.*, 338 U.S. 632 (1950) the tendency has been to acknowledge ample powers to the administrative bodies to order reports and investigate the organizations which they regulate and supervise. 1 Davis, Administrative Law § 3.06 (1958 ed.)

It was thus stated by the Supreme Court of the United States in the *Morton Salt* case:

"While they may and should have protection from unlawful demands made in the name of public investigation, *cf. Federal*

*Trade Comm'n* v. *American Tobacco Co.*, 264 U.S. 298, corporations can claim no equality with individuals in the enjoyment of a right to privacy. *Cf. United States* v. *White, supra.* They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities. The Federal Government allows them the privilege of engaging in interstate commerce. Favors from government often carry with them an enhanced measure of regulation. [Citations.] Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

"Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *Federal Trade Comm'n* v. *American Tobacco Co., supra.* But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. 'The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.' *Oklahoma Press Publishing Co.* v. *Walling*, 327 U.S. 186, 208. Nothing on the face of the Commission's order transgressed these bounds...

"Of course, there are limits to what, in the name of reports, the Commission may demand. Just what these limits are we do not attempt to define in the abstract. But it is safe to say that they would stop the Commission considerably short of the extravagant example used by one of the respondents of what it fears if we sustain this order—that the Commission may require reports from automobile companies which include filing automobiles. In this case we doubt that we should read the order as respondents ask to require shipment of extensive files or gifts of expensive books. This is not a necessary reading certainly, and other parties to the decree seem to have been able to satisfy its requirements."

■ In the work of Davis mentioned above, upon summarizing the state of the law as to the matter we are now considering, it is stated that a radical change has taken place since the decade of 1940. That the fishing expeditions which

former cases of the National Supreme Court had condemned are now permitted. It asserts that *Morton Salt* definitely established the standard now prevailing in this phase of administrative law, Davis, *op. cit.*, § 3.14.

To the same effect *Kerr Steamship Company* v. *United States*, 284 F. 2d 81 (2d Cir. 1960) ; *Pope & Talbot Inc.* v. *Smith*, 340 P.2d 960 (Ore. 1959). See, also, notes in 34 Minn. L. Rev. 696 (1950) ; 49 Mich. L. Rev. 436 (1951) ; 98 U. Pa. L. Rev. 921 (1950) ; 36 Va. L. Rev. 539 (1950).

Thus we see that the only limitation imposed on the regulating and supervising agencies is that the inquiry be within the authority of the agency, the demand be not too indefinite, and that the information be reasonably relevant.

If we consider what the Inspector requested, we will find that he is complying with what is held to be a reasonable requirement from an organization subject to the investigation and regulation of an administrative body. The information requested could be used by the Inspector to determine whether there had been irregularities in the business and operation of the cooperative. Obviously the data furnished in the annual report, as required by the afore-cited § 16, does not contain sufficient details to enable the Inspector to make a reasonable and just judgment of the activities of a cooperative. That is why the seventh subdivision authorizes him to request any other information he may deem necessary. The fact that he requests a detailed information more so than that included in the annual report, does not in any way mean that he doubts the information originally submitted. He is just interested in all those details which will enable him to make a reasonable and just judgment.

We know that the furnishing of this information in detail might open the doors to the disclosure of some confidential information which could be used by competitors of the cooperative if made public, and prove detrimental to its business. But we anticipate that the Inspector will exercise his sound

discretion in determining which of the data requested and submitted can be made public. We must not presume that he will not take into account the adverse effects that the disclosure of certain confidential information might cause a cooperative if it became known to the competitors.

On the other hand, we must not lose sight of the fact that all the members of a cooperative are interested in knowing how the organization to which they belong is operating. That is the guarantee of its success, as well as that the cooperative movement in Puerto Rico should grow progressively. Cooperatives should be a tool for the protection of producers and consumers and it is of significant public interest that all its operations be known to all who join in an effort to obtain the success thereof.

Hence, the judgment rendered by the Superior Court, Ponce Part, on April 17, 1957, will be modified by establishing that the Inspector of Cooperatives did not go beyond the powers conferred upon him by law in requiring the "Cooperativa Cafeteros de Puerto Rico" to submit a written report containing the information requested in his letter of April 21, 1953 which is copied in the appendix to this opinion. As to the other pronouncements of the judgment rendered by the trial court, the same shall stand.

### APPENDIX

"Office of the Sec. of Agriculture and Commerce

April 21, 1953

Board of Directors
Cooperativa Cafeteros de Puerto Rico
Ponce, Puerto Rico

Attention: Mr. Antonio Natali, President

Gentlemen:

To this date the Annual Report for the fiscal year terminated on September 30, 1952 has not yet been filed by that cooperative in the official form required by this Office.

A copy of the report rendered by your Outside Auditor, Mr. Gonzalo Aponte, on March 10, 1953 was received.

We have examined Mr. Aponte's report and we need the following information with respect to the statements listed below:

### Statement of Profits and Losses
#### (Exhibit B of Mr. Aponte's Report)

**1.** *Coffee Sales*

State total hundredweights of coffee sold in the United States and Europe giving the name of purchasers, addresses, amount sold to each one, selling price and amount of each sale. State whether coffee is raw or ground in each case. We are also interested in information as to the place where the sales contract of these items of coffee was executed.

**2.** *Coffee Purchases*

Please submit to us a break down of this item, worth $249,356.68. We are interested in details of the persons, addresses, hundredweights of coffee bought, classification of this coffee, the price paid per type and the total amount of each purchase.

**3.** *Costs of Hulling and Roasting of Coffee*

Submit a break down of these items.

**4.** *Sales Expenses*

    a. Salaries
    b. Advertisements
    c. Expenses of Coffee Sales in the United States
    d. Expenses of Coffee Sales in Europe
    e. Miscellanies

In relation with the afore-mentioned items please inform us the name, business, and amount paid for salaries. Analysis of the advertisement expenses, giving the name of the receivers and the amount paid. In relation with the expenses of Coffee Sales in the United States and Europe, please relate them giving information as to the name and address of the mediators to whom any commission was paid; if these items include traveling expenses give details thereof, and a complete analysis of other expenses included in these amounts. We are also interested in an analysis of the item on Miscellanies, and if salaries, commissions and traveling expenses are included in this item, supply the name and address of the receivers, item and amount paid.

**5. Administration Expenses**

    a. Salaries and Per Diem of Directors
    b. Bonuses to employees
    c. Expenses of Local Offices
    d. Expenses of the San Juan Office
    e. Insurance and Taxes
    f. Traveling Expenses of the Administrator
    g. Professional Fees and Hospitalization Expenses
    h. Gifts
    i. Cooperative Propaganda Expenses
    j. Miscellaneous Expenses

Details and analyses of these items concerning salaries, Director's per diem, bonuses to employees, expenses of local offices and of the San Juan Office. The name, occupation and amount paid in each case should be submitted. We need a break down of the insurance and tax expenses, giving the amount and item of each account. Complete details of the traveling expenses and expenses of the administrator, stating the name of officers and directors who incurred these expenses, as well as a complete analysis of the Administrator's expenses. A break down of the item on professional and hospitalization fees giving name of receivers and an account of the expenses. We are interested in a summary of every gift exceeding $100. A complete analysis of the cooperative campaign expenses as well as of that of the Miscellaneous item and if salaries, commissions and traveling expenses are included in these items, supply name and address of receivers, item and amount paid.

**6. Other Income**

    a. Interest and discounts received

State the amounts received for interest and discounts, itemizing the discounts received.

    b. Rents and Interest Distributed to Departments

Itemize this account and state method used for the distribution of expenses.

    c. Balance of Cancelled Reserve Account

Please submit information on this reserve account stating when it was created, why it was created, against what items they were charged, amounts of the original reserves used and reasons for cancelling it.

d. Profits in the Drying of Coffee

Submit a complete outline of this item stating income and expenses which produced this profit. Also state whether this income is distributed among a fixed number of sponsors or among all the members.

e. Miscellaneous Income

Itemize and explain nature of said income.

7. *Other Expenses*

a. Interest paid

Submit a detail of this interest giving name, address and amount paid to each receiver.

b. Depreciations

State rates used to compute the annual depreciation in each case.

8. *Amount Reserved for Refunds for Sponsorship, Emergencies, and Other Losses*

Submit complete details of this item stating basis for the refunds of sponsorship and total amount thereof. Amount assigned for emergencies and to cover other losses explaining the reasons therefor in each case.

9. *Liquidation Indicated to Producers*

It appears from the Auditors' report that the average Liquidation of coffee is $50.54. This Office is interested in knowing whether there was only one liquidation price on the basis of $50.54 per hundredweight of coffee or whether on the contrary there were several prices. In case that there were several prices please inform the liquidation prices and the bases used to reach such classifications.

*Statement of Profits and Losses*
Department of Sales of Products
(Exhibit C of Mr. Aponte's Report)

1. *Sales*

We are interested in obtaining a break down of this item either by products or by principal departments. Information should be supplied concerning sales to members and nonmembers, stating the total in each case.

2. *Expenses in Sales of Products*

a. Advertisements

b. Salaries and Wages

c. Expenses of Administrator

d. Expenses of Salesmen

e. Salary and Expenses of the Agronomist

f. Expenses of Fort Dodge Products

g. Miscellaneous Expenses

With relation to the advertisement item please itemize these expenses, showing to whom these payments were made. As to the item of salaries and wages we want the name, business and amount accrued in each case. Itemize expenses of the Administrator as well as of the salesmen. You shall also submit the agronomist's name and his fixed salary explaining in detail the expenses and the work performed by him. We are interested in a list of Fort Dodge expenses as well as of the miscellaneous expenses.

3. *Other Income*

a. Refunds of Sponsorship

This Office is interested in knowing from whom this sponsorship was received and if the same was a cash income or on credit for purchases.

4. *Other expenses*

a. Interest, Rents and Other Charges

Submit break down of this item with as much detail as possible.

b. Depreciations

State the rates used for computing the annual depreciation in each case.

*General Balance Sheet*
(Exhibit A of Mr. Aponte's Report)

1. *Accounts Receivable*

This Office wishes to have a list of the debts of producers amounting to $35,820.47 which appear in Mr. Aponte's report.

We are interested in an itemized list of the Accounts Receivable of the Department of Sales of Products especially those accounts for more than 90 days given on page 7 of the Report.

We are also interested in an itemized list of the accounts receivable of the Leche Rico Department; clients' checks rejected by the bank with remarks as to why the steps to collect from José Sabater Porrata have not been taken; indicating said gentleman's relation, if any, with the administration or directors of the cooperative.

Itemize the employees' debts stating name, occupation and amount owed by each one. As well as a complete recital of the accounts receivable under the title miscellanies.

2. *Inventories*

This Office is interested in knowing whether that cooperative carries a file or a permanent Inventory Registry or whether inventories are determined on the basis of an actual enumeration at the closing of operations. If the second procedure is employed, indicate who made this inventory and the method employed for the evaluation thereof.

3. *Deferred Expenses*

a. 1952-1953 Crop
Remit break down of this item.
b. Loss and liquidation expenses of the Milk Department.

At page 11 of the report this item appears with $34,115.56. We want a detailed analysis of this amount. We are also interested in being informed as to the reasons why these expenses are deferred and how it is intended to liquidate this loss.

4. *Accounts Payable*

a. Refund for Sponsorship of the Department of Sales of Products

At page 12 of the report it is stated that the amount of $29,294.03 represents 2% of the Total Sales for the year terminating on September 30, 1952. Pursuant to the Exhibit of said report the sales amount to $2,071,512.99. We wish to know which sales did not receive refunds for sponsorship. We are also interested in knowing whether the sponsorship refund is included in the returns and bonuses item, worth $32,332.52 which appears in the above-mentioned Exhibit C.

If the refund of sponsorship were not included in the returns and bonuses item, nor in the interest Rents and other Charges item, worth $66,647.13, we want to know why a sponsorship has been established in excess of the profits reported by the Department of Sales of Products for a value of $23,869.56.

5. *Reserves*

1. Reserves for Emergencies and Contingencies

At the commencement of operations, according to the Auditor's report on September 30, 1951, there was an Emergency Reserve of $6,200. At the end of the year, according to the

Auditor's report corresponding to the year terminated on September 30, 1952, the Emergency Reserve appears with a balance of $3,007.12. This Office does not recall having authorized any charge against said reserve pursuant to that provided by the General Cooperative Associations Act. Please remit a break down with the movement of this account during the year, and at the same time indicate whether during the year this account received additional credit from the distribution of the profits of 1952.

*Revolving Fund Certificates*

Please inform all transfers of Revolving Fund certificates effected since the creation of said fund giving: Name of original holder, name of the person to whom it was transferred, total amount of the certificates transferred, date of the transfer stating also, whether any of the parties involved was a member of the Board of Directors or officials or employee of the Cooperative at the time of the transfer.

The above-mentioned information shall be certified by your outside auditors and since it is urgent, you are granted a 30-day term from the date hereof to submit to this Office the information requested. The term granted expires on May 21, 1953.

Respectfully yours,

CARLOS M. MATOS
Inspector of Cooperatives
of Puerto Rico

R B M/oisa"