NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The GREAT ATLANTIC & PACIFIC
TEA COMPANY, P & C Food Markets,
Inc., and American Stores Company, Respondents.

No. 202, Docket 28916.

United States Court of Appeals
Second Circuit.

Argued Dec. 7, 1964.

Decided Jan. 14, 1965.

Stephen B. Goldberg, N. L. R. B. (Arnold Ordman, General Counsel; Dominick L. Manoli, Assoc. Gen. Counsel; Marcel Mallet-Prevost, Asst. General Counsel; Jules H. Gordon, Washington, D. C., on the brief), for petitioner.

Burton A. Zorn, Proskauer, Rose, Goetz & Mendelsohn, New York City (Saul G. Kramer, Robert A. Gorman, New York City, Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., M. Kalman Gitomer, Herbert H. Brown, Philadelphia, Pa., on the brief), for respondents.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

In rather rapid succession, we are called upon once again to decide whether certain conduct violated the proscription in the National Labor Relations Act against encouragement or discouragement of "membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment." Section 8(a) (3), 29 U.S.C. § 158(a) (3). See NLRB v. Local 50, American Bakery Workers, 339 F.2d 324 (2d Cir. 1964). The National Labor Relations Board petitions for enforcement of its order based upon findings that the Great Atlantic & Pacific Tea Co., P & C Food Markets, Inc., and American Stores Company (collectively, "the respondents") violated Section 8(a) (3) and (1). The respondents have cross-petitioned to set aside one portion of the Board's order.

The Board approved its trial examiner's findings and conclusions that the respondents committed an unfair labor practice by threatening to lock out and by locking out their store employees, members of District Union Local 1, Amalgamated Meat Cutters & Butchers Workmen of America, AFL-CIO ("Meat

Cutters"), in response to a Meat Cutters strike against another chain of retail food stores (Loblaw, Inc.). We enforce this portion of the Board's order,[1] not contested by the respondents. But the Board also found an unfair labor practice, contrary to the trial examiner's findings and conclusion, in the consequential layoffs of warehouse and bakery employees ("service employees")[2] because of lack of work caused by the lockout of store employees. We agree with the respondents that this latter finding must be set aside for lack of any evidence that the respondents either intended to discriminate on the basis of union membership or activities, or that their conduct had an effect of discouraging such membership or activities.

While the respondents do not challenge the Board's order respecting the lockout of store employees, it is necessary that we set forth the relevant facts which led the Board to hold the lockout unlawful—albeit summarily—because of their pertinence to the remaining issue before us. For many years· the respondents bargained individually with the Meat Cutters as the representative of all their store employees, including cashiers and stock clerks as well as butchers, in the Syracuse, New York, area. At the time the dispute which led to these proceedings occurred, the Meat Cutters' contracts with the respondents and with Loblaw were scheduled to expire at various dates in April 1961. Before the expiration dates, however, the respondents, together with Loblaw and two other retail food chains, determined that multi-employer bargaining should replace separate negotiations with the Meat Cutters. As a result, they organized the Food Employers Labor Council of Syracuse for this purpose.

Although the Meat Cutters exchanged contract proposals with the Council, negotiations soon ran aground because the union denied that it had recognized the Council as the industry-wide bargaining agent. After several heated confrontations, it became apparent that industry-wide agreement was impossible and, so, the Meat Cutters announced they were striking Loblaw, whose contract had by that time expired. The food chains warned that if Loblaw was struck, all other Council members would close their stores to protect the solidarity of what they believed to be a legitimate multi-employer unit from the effect of the "whip-saw" strike against Loblaw.

Both sides remained firm and the respondents soon closed down their stores. An unfortunate by-product of the shut-down was that the warehouse and bakery employees, who concededly were not involved in the dispute between the employers and the Meat Cutters, were left without work to perform, except for some minor operations, and within a few days their layoff followed. When the Meat Cutters' dispute was ultimately settled, all laid off and locked out employees returned to work. Upon charges soon filed by individual store employees and the unions representing the service employees, the General Counsel issued complaints alleging that respondents had violated Section 8(a) (3) and (1).

I.

■ Initially, we have no difficulty endorsing the Board's conclusion that respondents' lockout of store employees represented by the Meat Cutters in response to the Loblaw strike was unlawful. The respondents concede that substantial evidence supported the trial ex-

1. The Board did not order any backpay for the store employees because they were compensated for their loss through a settlement agreement which the Meat Cutters negotiated with the respondents.

2. The warehouse employees of the three respondents were represented by Truck Drivers & Helpers Local Union No. 317, an affiliate of the International Brother-

hood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Independent ("Teamsters"). A & P alone operated a bakery to supply its stores in the Syracuse area; the bakers were represented by Bakery Factory Workers Local #116, American Bakery & Confectionery Workers' International Union of America, AFL-CIO ("Bakery Workers").

aminer's finding that the Union had not agreed—except to the extent of participation in negotiations—to a multi-employer unit. This takes the instant dispute outside that class of defensive lockouts sheltered by the Supreme Court's Buffalo Linen decision, NLRB v. Truck Drivers Union, 353 U.S. 87, 77 S. Ct. 643, 1 L.Ed.2d 676 (1957), upholding the validity of a lockout employed defensively to preserve the integrity of a recognized multi-employer unit. But, here, since the Meat Cutters had not, either by word or deed, committed themselves to industry-wide bargaining, the food chains' conduct lost the protective quality which justified the Buffalo Linen lockout and, instead, assumed the character of an offensive weapon which would unfairly advantage the employers in their demands for a multi-employer unit. See Body & Tank Corp. v. NLRB, 339 F.2d 76 (2d Cir. 1964); Quaker State Oil Refining Corp. v. NLRB, 270 F.2d 40 (3d Cir.), cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 185 (1959).[3] The Board properly found, therefore, that this conduct violated Section 8(a) (3) and (1).

## II.

■ But, we cannot accept the Board's wholly conclusory holding, without any evidentiary basis whatsoever, that the incidental layoffs of warehousemen and bakers also violated Section 8(a) (3) and (1). We have come to this determination because we find nothing in the record to establish the two elements vital to a finding that the respondents unlawfully discriminated against the service employees. There is not a scintilla of evidence establishing either (a) that the food chains intended to discriminate on the basis of union membership or activities or (b) that an effect of the layoffs was to discourage such membership or activities. See Local 357, Intern. Broth. of Team., Chauffeurs, Warehousemen and Helpers of America v. NLRB, 365 U.S.

667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); NLRB v. Miranda Fuel Co., 326 F.2d 172 (2d Cir. 1963); Quality Castings Co. v. NLRB, 325 F.2d 36 (6th Cir. 1963); Pittsburgh-Des Moines Steel Co. v. NLRB, 284 F.2d 74 (9th Cir. 1960).

■■ Looking to the Supreme Court for our guidance in this developing area of the law, we observe that it has consistently recognized that the employer's intent or motive in acting discriminatorily is an important factor to be considered in Section 8(a) (3) cases. Radio Officers' Union of Commercial Telegraphers Union AFL v. NLRB, 347 U.S. 17, 42–44, 74 S.Ct. 323, 98 L.Ed. 455 (1954); NLRB v. Erie Resistor Corp., 373 U.S. 221, 227, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). Indeed, it noted recently that "the 'true purpose' or 'real motive' * * * constitutes the test" of whether there is unlawful encouragement or discouragement of union membership by discriminatory action. Local 357, I. B. T., etc. v. NLRB, 365 U.S. 667, 675, 81 S.Ct. 835, (1961). Adapting this precept to the present case, there is nothing before us from which we can reasonably determine that the "real motive" of the respondents was discriminatory. We are not unmindful, in this connection, of the stipulation in the record that the layoff of service employees was due solely to lack of work resulting from the store shutdowns, and, that there was no labor dispute between the food chains and the unions representing these employees. Indeed, it is clear that when there was work to be done in the warehouses during the shutdowns, employees were retained for that purpose.

■ The Board seeks to vault these barriers and discharge its burden of proving the statutorily required discrimination against the bakers and warehousemen by picturing their layoff as the inevitable result of the unlawful Meat Cutter lockout. But, such an approach is too facile and effectively reads the re-

3. We agree with the Board that it is unnecessary to decide whether the use of a lockout to protect multi-employer units

upon which final agreement is reached in negotiations, but which have no historic support, would fall within Buffalo Linen.

quired showing of "motivation" out of the statute. Assuming, *arguendo*, that the respondents reasonably anticipated that a lockout of Meat Cutters could ultimately lead to a layoff of other employees, this would, nevertheless, fall short of establishing that they were motivated by a desire to discriminate against the service employees. Foreseeability is not the equivalent of discriminatory motivation.[4]

We recognize that there are instances, indeed, where the Board need not present specific proof of improper intent or motive. See Radio Officers Union etc. v. NLRB, 347 U.S. 17, 74 S. Ct. 323 (1954); NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139 (1963). But, we should note that the Radio Officers' case was limited by the Supreme Court to situations where the employer's conduct is "inherently" discriminatory. 347 U.S. at 45, 48, 74 S.Ct. 323.[5] When union-membership considerations form the sole basis of an employer's action against certain employees, the likelihood that protected union activities will be encouraged or discouraged is so great that improper motivation will be presumed without direct proof.

The exception, however, cannot swallow the rule. The restricted scope of the inherently-discriminatory principle is illustrated by Quality Castings Co. v. NLRB, 325 F.2d 36 (6th Cir. 1963). There, the Board held that an employer profit-sharing plan was dis-criminatory because it excluded from participation employees who had not worked one-half the scheduled working time during a given period. The Board urged that the Radio Officers' rule was applicable since the employer must have foreseen that he would exclude from participation many employees who had engaged in a protracted strike during the measuring period. We agree with the Sixth Circuit Court of Appeals in its refusal to apply the inherently-discriminatory exception to excuse a failure of direct proof of improper motivation. "When * * * an employer's action is not specifically directed against those who have engaged in protected types of union activity," the court declared, "but is rather directed at a group which is defined by other than union membership or activity criteria, and which clearly includes others who did not engage in the protected, concerted activities, the Board not only must prove discrimination but also it must prove the employer's motivation." 325 F.2d at 41.[6]

An employer's activity is "inherently discriminatory" under the *Radio Officers'* doctrine when it rewards or punishes employees because of their union membership or activities. Thus, in NLRB v. Local 50, American Bakery Workers, 339 F.2d 324 (2d Cir. 1964), we recently held that specific proof of unlawful motivation was unnecessary where an employee lost his seniority rights simply because he had taken out

---

4. It is appropriate, moreover, that we note that respondents' dispute with the Meat Cutters did not reveal an hostility toward unions as such; the lockout of that union was, as the trial examiner recognized, in the mistaken but good faith belief that such a course could be taken to preserve the multi-employer bargaining unit.

5. This limitation was reiterated in Erie Resistor when the Court carefully noted that "*some* conduct may by its very nature contain the implications of the required intent" and that "the intent necessary for an unfair labor practice may be shown in different ways." 373 U.S. at 227, 83 S.Ct. at 1144 (emphasis added).

6. Other courts have recognized that when criteria other than union membership or activity are used as the basis for an employer's discrimination, the exceptional rule of Radio Officers' does not apply since the kind of discrimination which impelled the rule is absent. "It is then up to the Board," the court wrote, "to predicate a conclusion of unlawful intent upon more specific evidence; a showing of the discriminatory treatment plus its natural and foreseeable consequences will not suffice." Pittsburgh-Des Moines Steel Co. v. NLRB, 284 F.2d 74, 83 (9th Cir. 1960). Cf. Melville Confections, Inc. v. NLRB, 327 F.2d 689 (7th Cir.), cert. denied, 377 U.S. 933, 84 S.Ct. 1337, 12 L.Ed.2d 297 (1964).

a withdrawal card from his union. And it was inherently discriminatory in Erie Resistor, supra, to award an unearned seniority crèdit of twenty years to replacements for strikers and to employees who returned to work while the strike was in progress.[7]

In this litigation, as we have already noted, the layoff of warehousemen and bakers concededly resulted from lack of work and was entirely unrelated to their participation in union activities. The circumstances which permit the Board to import the required discriminatory motive without direct proof are thus wholly absent.

### III.

Although our holding with respect to respondents' motivation would be sufficient to deny enforcement, the Board's order vis-a-vis the warehouse and bakery employees is vulnerable on even more basic grounds. Not a spark or trace of evidence appears in the record to establish that the layoffs in fact tended to discourage their union activities. Although the Board did find that they "would be just as 'ineluctably' discouraged from union membership as were the store employees," the only possible basis for this wholly conclusory determination of "ineluctability" can be the Board's "prescience" that since the secondary layoffs occurred contemporaneously with the Meat Cutter lockout and had the same economic impact, it would have to follow as night from day that the service employees would be discouraged from union membership.

If we are not to abdicate entirely our function upon review, we can hardly accept such an inferential conclusion as dispositive. We have not ignored the possibility that the bakers and warehousemen might "suspect" that the food chains would take similar lockout action to achieve multi-employer bargaining with their unions on some future occasion. But, such suspicions are too remote to support a finding that union membership was or would be discouraged. Furthermore, whatever its severity, the loss of wages by the service employees can hardly be attributed to their union affiliation and it must be agreed that the consequences would have been the same whether or not they belonged to a union.

Indeed, we reject the Board's novel and non-evidentiary mechanistic foreseeable consequences rule precisely because it has "no place in an area of the law already overburdened with hypothetical conjectures remote from the realities of industrial existence." See NLRB v. Local 50, American Bakery Workers, 339 F.2d 324, 329 (2d Cir. 1964). If we were to apply the Board's inference of unlawful motivation and discouragement in every instance where employees are temporarily laid off under circumstances present here, we would ignore entirely the well-established fact that such secondary layoffs have always been considered an incident of economic life. See New York Mailers' Union No. 6, Intern. Typographical Union, AFL–CIO v. NLRB, 327 F.2d 292, 300 (2d Cir. 1964); Local 50, Bakery and Confectionery Workers, Intern. Union of America, AFL v. General Baking Co., 97 F.Supp. 73 (S.D.N.Y.1951).

### IV.

Finally, we should note that our conclusion today is squarely supported by the recent decision in Philadelphia Marine Trade Ass'n v. NLRB, 330 F.2d 493 (3d Cir.), cert. denied sub nom. International Longshoremen's Ass'n Local 1242 v. NLRB, 85 S.Ct. 65, 13 L.Ed.2d 41 (1964), where the Board urged a position diametrically opposed to its present one. It contended there that the court should *reject* the principle that once a primary lockout is found unlawful, em-

7. Radio Officers' involved three instances of inherently discriminatory conduct—an employee demoted in seniority at the behest of his union because of delinquency in dues payments; an employee refused work clearance by his union for violating its rules; and an employee denied wage and vacation payments because he did not belong to a union.

ployers must automatically be equally responsible for the foreseeable, consequential layoffs of neutral workers.

Since the facts in PMTA are of some importance and so closely resemble this case we will recite them briefly. The members of a multi-employer bargaining unit locked out longshoremen because their union had ordered a work stoppage against one member to protest allegedly hazardous working conditions. As a result of the lockout, checkers, maintenance men and timekeepers, who were represented by sister locals and whose work depended on the longshoremen, were also laid off. The primary lockout was held unlawful because a refusal to work where conditions are unsafe is expressly protected by Section 502 of the Labor Act, 29 U.S.C. § 143. But, the Board held that there was no discrimination in the resulting layoffs of neutral employees. In striking contrast to its assertion before us, the Board contended before the court that the neutrals' loss of work did not result from any discriminatory action against them and was simply an incidental consequence of the lockout of longshoremen. The court agreed with the Board's realistic view, noting that the unfortunate consequential injury to the neutrals occurred because of the nature of their work and not by virtue of their membership in any union.

The Board has attempted disingenuously to draw a distinction between the two cases by suggesting that the bakers and warehousemen were discouraged from participation in bargaining strikes while the neutrals in PMTA were only discouraged from resigning their positions because of abnormally dangerous conditions. But, this "distinction" lacks legal significance or substance. A protest against unsafe working conditions, specifically protected by the Act, is as vital a union activity as a strike in support of bargaining activities. The critical and distinctive issue for determination, recognized in PMTA and present here as well, is whether when a lockout of one group of employees leads to a consequential loss of work by other employees, with whom the employer has no dispute, there is a violation of Section 8(a) (3) and (1). The Board in PMTA and the Third Circuit Court of Appeals, held in the negative and we agree.

Although the Board's expertise deserves respect, its conclusions must have some evidential or rational inferential support before we can endorse them. We find this completely absent here. Every case in this difficult and subtle area must be decided on its particular facts. We cannot adopt the Board's Pavlovian rule that wherever there is a lockout the consequential layoffs of neutral employees violate the Act.

Enforcement granted in part and denied in part.