434 F.2d 884
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BAGEL BAKERS COUNCIL OF GREATER NEW YORK and Its Employer-Members, Respondents.
BAGEL BAKERS COUNCIL OF GREATER NEW YORK and Its Employer Members, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondents.
 No. 36.
 No. 37.
 Docket 34159.
 Docket 34186.
 United States Court of Appeals, Second Circuit.
 Argued September 21, 1970.
 Decided November 20, 1970.
 
 Leon Brickman, Brooklyn, N. Y., for Bagel Bakers Council and its Employer-Members.
 Elliott Moore, Atty. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael Messitte, Atty., on the brief), for N. L. R. B.
 Before LUMBARD, Chief Judge, ANDERSON and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order, which found that the Bagel Bakers Council of Greater New York and its employer-members had failed to bargain in good faith with Bagel Bakers Union Local 338 and had unlawfully locked out employee members of that Local and of Bakery Drivers Union Local 802.[1] The Council cross-petitions for review of the same order. We enforce the order of the Board as to violations with respect to Local 338. We reverse the Board's determination with respect to Local 802.
 
 I.
 
 2
 Each of the respondent employers manufactures and sells bagels, which may be technically described as hard rolls shaped like doughnuts, although such a description is like calling a sunset a collection of colors.[2] Respondents are all members of the Bagel Bakers Council, which was formed some years ago for social reasons and to aid the member employers in discussing common problems. Just how much aid the Council was to furnish and on what problems are important issues in the litigation because their resolution determines a basic jurisdictional issue. The Board concedes that its monetary standards for asserting jurisdiction would be met only if the individual businesses were part of a multiemployer bargaining unit. Therefore, we must consider first the Board's finding that the Council members engaged in multiemployer bargaining with Local 338.
 
 
 3
 Among the subsidiary findings of the Board on this issue were the following: For some years a committee of Council members, headed by Council President and full-time employee Isidore Glass, had negotiated collective bargaining agreements with the unions representing employees of Council members. When agreement was reached, the practice was for the contract to be approved by the Council and then signed by the individual members.[3] When Local 338 struck three shops in 1966, the members of the Council dealt jointly with Local 338 through the Council, even though the union protested that its contract was with individual employers, not with the Council. In addition, the Council's Financial Secretary admitted that in bargaining for the 1967 contract, which led to the unfair labor practice findings now under review, the Council committee was seeking for Council members a contract that would be "one for all and all for one." Based upon this and other evidence, the Board found that the business of respondent employers was properly considered collectively.
 
 
 4
 In determining whether a multiemployer unit was appropriate, the standard applied by the Trial Examiner, and affirmed by the Board, was
 
 
 5
 whether Respondent employers have expressly or by implication indicated their intention to be bound in collective bargaining by group, rather than individual action.
 
 
 6
 In other cases, the Board has stated the test somewhat differently, adding as an integral part thereof the question whether the union "has been notified of the formation of the group and the delegation of bargaining authority to it, and has assented and entered upon negotiations with the group representative." See, e. g., Weyerhauser Co., 166 N.L.R. B. 299 (1967). The test phrased in that manner was specifically approved by the Court of Appeals for the District of Columbia in Western States Regional Council No. 3, International Woodworkers of America v. NLRB, 130 U.S.App. D.C. 176, 398 F.2d 770, 773 (1968). We have impliedly accepted the proposition that the validity of a multiemployer unit depends not only upon the intent of the employers but the acceptance of the group unit by the union. See NLRB v. Great Atlantic & Pacific Tea Co., 340 F.2d 690, 693 (2d Cir. 1965). Therefore, it might be argued that the test used by the Board here was inadequate since it ostensibly focussed only on the intention of the employers. However, such an objection would be undue formalism on this record since the Board made subsidiary findings, which showed union acceptance of the group unit.
 
 
 7
 On the ultimate finding of employer intent, no express agreement to be bound by group action was required, see NLRB v. Sightseeing Guides and Lecturers, Local 20076, 310 F.2d 40, 42 (2d Cir. 1962), although that sometimes exists. Rather, as we have indicated in a slightly different context, "[a] history of multiemployer bargaining may suffice." Publishers' Association of New York City v. NLRB, 364 F.2d 293, 295 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 509, 17 L.Ed.2d 435 (1966). The facts set forth above, adequately supported by the record, show that there was more than enough history here of employer intent.[4] As to union reaction, the Examiner found that for some years bargaining had gone on between the Council and Local 338. Union acceptance of the group unit was therefore obvious.[5] The Council emphasizes that the employers signed separate contracts and that no employer formally authorized the Council to act upon its behalf for negotiating a contract or processing a grievance, even though the 1966 individual contracts provided a mechanism for doing so. There is no doubt that the Board considered these facts; the Examiner's opinion refers to them. Yet the Board concluded that the contrary evidence of intention to engage in group bargaining nonetheless was stronger. Based upon this record, that was a finding with which we should not interfere.
 
 II.
 
 8
 We turn now to the other questions in the case. The Board found that in December 1966 the Council and Local 338 began bargaining for the 1967 contract. Between that time and January 31, 1967, the expiration date of the existing contract, a number of negotiating sessions were held. Local 338 sought no pay increase but only a two-year extension of the existing contract. Respondents claimed to be losing money because of increased competition from automated manufacturers, non-union shops and out-of-town producers shipping frozen bagels into the metropolitan area, and demanded a 40 per cent reduction in labor costs as a condition of a new agreement. Local 338 replied that it would consider a "roll back" in labor costs on the basis of individual demonstrated need. It therefore requested those Council members losing money either to allow Local 338 to examine their books or to bring in audits in support of their position. At one of the meetings, the Council indicated that it might take less than a 40 per cent cut but made no specific offer. Union negotiators told the Council:
 
 
 9
 Bring your books to us. Bring an audit, accountant's report. Show us where you are losing money so we can guide ourselves and know in which direction we're going.
 
 
 10
 The Council's demand for a roll back and the union response were repeated at other meetings.
 
 
 11
 In January, Council President Glass met privately with three Local 338 negotiators, and admitted that not all of the employers were losing money, "but certain of my members want to take advantage of this situation * * * they want this 40 percent reduction." At no time did the Council produce any records to buttress its call for a roll back. With regard to the union demand for a two-year contract, the Council countered by proposing a day-to-day, week-to-week, or at most a month-to-month, contract. At the climactic January 31 negotiation session, no agreement was reached. During that meeting, the Council took the position "no contract, no work." Local 338 representatives indicated that they did not intend to strike when the contracts expired and reaffirmed this position at a membership meeting early the next morning. However, when Local 338 members reported for work the next day, the respondent Council members were closed. The employers began operations again two days later with new employees and family members doing the work.
 
 
 12
 The Board found that the respondent employers had violated sections 8(a) (5) and 8(a) (1) of the Act by failing to bargain in good faith with Local 338, and that they had unlawfully locked out employee members of Local 338 and Local 802 on February 1, 1967, in violation of sections 8(a) (3) and 8(a) (1).[6] Respondents strenuously dispute these findings, claiming, among other things, that they did not engage in bad-faith bargaining, that there was no lockout and that they did not receive a full and fair hearing before the Board.
 
 
 13
 The Board's finding of bad-faith bargaining was based upon the Council's failure to produce records to support a claimed inability to pay and upon its insistence on a contract of unreasonably short duration. There is no doubt that if these characterizations of the Council's conduct are accurate, they may properly be regarded as sufficient evidence of bad-faith bargaining. As to refusal to furnish information, we have only recently reviewed the cases in NLRB v. General Electric Co., 418 F.2d 736, 749-53 (2d Cir. 1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L. Ed.2d 257 (1970). We there quoted from NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 152-53, 76 S.Ct. 753, 100 L.Ed. 1027 (1936), that if a claim of inability to pay "is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." That observation was made regarding inability to pay an increase in wages; it applies a fortiori to an alleged need for a massive decrease. Similarly, insistence on a contract of unusually short duration can evidence bad-faith bargaining. Solo Cup Co. v. NLRB, 332 F.2d 447, 449 (4th Cir. 1964).
 
 
 14
 Thus, the issue before the Board was primarily factual, and it is on that level that the Council argues in this court. The Council claims, inter alia, that there never was any real demand for economic justification by the union, that the union knew anyway that production was declining rapidly in each shop, and that if anyone engaged in bad-faith bargaining, it was the union. However, there is substantial support in the record for the finding that constant union demands for economic data were made, and the Trial Examiner flatly rejected as "not credible" the contrary testimony of the Council's Financial Secretary. Local 338's awareness that production was generally declining was a far cry from knowing which, if any, of respondents could actually justify a 40 per cent wage cut. Finally, the claim that the union bargained in bad faith is simply not borne out by the record. The union's acknowledgment of economic reality by not seeking a wage increase was evidence of that. Accordingly, we conclude that the Board's finding that the Council bargained in bad faith should be sustained.
 
 
 15
 The same factual attack is made on the finding that the respondent employers locked out their Local 338 employees on February 1. Respondents argue that there was no lockout because the employees themselves decided not to report back to work. However, before the Trial Examiner, the Council apparently admitted that Local 338 was locked out, but claimed that the lockout was legal. On this record, we would not set aside the factual determination that there was a lockout. As to its legality, respondents rely on Detroit Newspaper Publishers Association v. NLRB, 346 F. 2d 527 (6th Cir. 1965), vacated, Newspaper Drivers and Handlers, Local Union No. 372, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Inc. v. Detroit Newspaper Publishers Ass'n, 382 U.S. 374, 86 S.Ct. 543, 15 L.Ed.2d 423 (1966). In that case, however, there was no finding, as there was here, that the lockout was part of an improper bargaining scheme and therefore violated section 8(a) (3) of the Act. Since the lockout in this case was in support of bad faith bargaining and not merely to bring economic pressure to bear upon a legitimate bargaining position, it falls outside the conduct protected in American Ship Building Co. v. NLRB, 380 U. S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).
 
 
 16
 Respondents also claim that they did not receive a fair hearing because they were prevented from presenting crucial evidence and because the conduct and rulings of the Trial Examiner were improper and prejudicial. The rulings in question covered for the most part such matters as the admissibility of evidence and the scope of cross-examination. We have examined the rulings and they were well within the discretion of the Trial Examiner. Similarly, the comments of the Examiner were far short of showing the prejudice claimed.
 
 
 17
 Respondents also complain that the Examiner refused a 30-day continuance to allow Glass to testify following surgery. Glass had been present during the first week of hearings before the Board, and had engaged in negotiating sessions the day before the request for a continuance. The Examiner offered to take the testimony of Glass at his home. At the time, the lockout was in progress, the Board was contemporaneously seeking an injunction against respondents under section 10(j) of the Act, and the district court was deferring action on that petition until receipt of the record before the Examiner.[7] Before the Board, the only specific prejudice claimed by the Council was that Glass would have denied the admission attributed to him that not all Council members were losing money. At that time, the Council did not assert, as it does now in this court, that Glass would have testified regarding the existence of a multiemployer bargaining group.[8] Under all of these circumstances, we hold that there was no prejudicial abuse of discretion in the Examiner's ruling.
 
 
 18
 Respondents advance other arguments why the Board's order should not be enforced; e. g., the case is moot because the parties allegedly subsequently reached agreement and the employees returned to work. However, there are obviously back pay issues still to be determined and, in any event, on this record "the Board is entitled to have the resumption of unfair [labor] practices barred by an enforcement decree." See NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 567, 70 S.Ct. 826, 829, 833, 94 L.Ed. 1067 (1950). We also reject respondents' claim that two employers, Pops Bagel Bakery, Inc. and Rubenstein Bagels, Inc. should not be subject to the findings made against the Council. With respect to Pops, we find substantial evidence on the record that the Council had authority to bargain for Pops even if Pops was never an official member of that organization. Likewise, there is substantial evidence to support the Board's finding that both the corporate and partnership forms of Rubenstein constituted a single integrated business enterprise responsible for remedying the unfair labor practices. Finally, respondents point out that Nelson Bagel Bakery, Inc. was not named in the Local 338 complaint and hence failed to proffer the affirmative defense that its Local 338 employees were on strike at the time of the lockout. To expedite the matter and yet fairly preserve Nelson's rights, we order that Nelson be allowed to present this defense at the compliance proceeding, as the Board suggests, and that the burden of proof on this issue be the same as if Nelson were defending an unfair labor practice charge.
 
 
 19
 We have considered respondents' other arguments and conclude that none of them, except for those discussed in Part III below, justifies refusing to enforce the Board's order.[9]
 
 III.
 
 20
 Finally, we consider the alleged violations of sections 8(a) (1) and 8(a) (3) with respect to Local 802. The Board found that contracts between Council members and Locals 338 and 802 commonly expired on the same date. The practice was for the employers to bargain with Local 338 first and, when an agreement was reached, to begin negotiations with Local 802. Upon expiration of the 1966 contract, the Council President told a Local 802 official that the Council and Local 338 "were miles apart," and "[w]e can't use your drivers, notify your people we do not need them." On the following day, Local 802 received a telegram confirming this statement. Subsequent efforts by the drivers to work proved futile. The wholesale portions of respondents' businesses were sharply reduced, although not completely abandoned. Some wholesale customers picked up their own bagels while deliveries were made by owners, their families or employees who were not members of Local 802.
 
 
 21
 The Board concluded that Council members had locked out employees belonging to Local 802. It then found that the lockout was "part and parcel" of the lockout of Local 338 in support of the Council's unlawful bargaining with Local 338. The Board concluded that "[t]he lockout, therefore," constituted discrimination "not only against bakers, but against the drivers as well, and had the natural effect of discouraging membership in Local 802 within the meaning of section 8(a) (3) of the Act * * *."
 
 
 22
 The Board's finding that the employers locked out members of Local 802 is supported by substantial evidence on the record. Nevertheless, we cannot agree with its conclusion that the lockout violated sections 8(a) (1) and 8(a) (3) of the Act. First, except for an attempted distinction of our decision in NLRB v. Great Atlantic & Pacific Tea Co., 340 F.2d 690 (2d Cir. 1965), which is discussed below, the above quoted language of the Examiner constitutes the entire justification for the findings of discriminatory intent and discouragement of union membership vis-a-vis Local 802, both of which are required by A & P. We would not hasten to enforce an order based upon such conclusory findings. Second, the scanty analysis offered by the Examiner does not withstand scrutiny. In light of the drivers' distinctly subsidiary bargaining position, it is not apparent on this record how locking them out substantially supported the Council's unlawful bargaining with the bakers. Moreover, even if locking out the drivers had that effect, it was still an action aimed at the bakers, by the Examiner's own reasoning, and accordingly discouraged membership in Local 338, not in Local 802. The lockout of the bakers was illegal because it was designed to implement illegal bargaining with Local 338. There was no finding, however, that respondents failed to bargain with the drivers; indeed, as the Examiner recognized, bargaining with them had not yet really begun. Had there been such a finding, the case would be different.
 
 
 23
 Finally, we must consider the effect on this case of A & P, supra. In that case, there was a dispute between a group of supermarkets and a meat cutters local, during which the employers locked out the meat cutters. Consequently, warehouse and bakery employees not involved in the initial dispute were left without work to perform and layoffs resulted. Although this court agreed with the Board that the lockout of the meat cutters had been illegal, we nevertheless reversed the finding of violations of sections 8(a) (1) and 8(a) (3) with respect to the layoff of warehouse and bakery employees. We rejected the Board's position that the required showing of improper motivation is met when the employer could reasonably anticipate that the lockout of one union could ultimately lead to the layoff of other employees: "foreseeability is not the equivalent of discriminatory motivation." 340 F.2d at 694. We also rejected the Board's conclusion that
 
 
 24
 since the secondary layoffs occurred contemporaneously with the Meat Cutter lockout and had the same economic impact, it would have to follow as night from day that the service employees would be discouraged from union membership.
 
 
 25
 Id. at 695.
 
 
 26
 Applying A & P to this case, it appears that the only basis for the finding of discouragement of union membership vis-a-vis Local 802 employees was the inference from contemporaneity that A & P found invalid. The Examiner distinguished A & P because in that case there was no "dispute" with the warehouse and bakery workers, and because the company there shut down all operations. We do not believe either alleged distinction justifies ignoring A & P. While the Examiner correctly noted that in this case "negotiations for a new contract [with the drivers] * * * were in order," he also acknowledged that respondents had not yet really begun to negotiate with the drivers. Hence, as in A & P, there was as yet no real dispute with the drivers. Similarly, although it is true that respondents "continued to operate, albeit on a reduced scale," it is also clear, as it was in A & P, that because of the economic realities flowing from the great reduction in business, for the most part the loss of wages by the drivers "can hardly be attributed to their union affiliation * * * and the consequences would have been the same whether or not they belonged to a union." 340 F.2d at 695. Perhaps the true basis for the Examiner's decision was his statement that, in any event, he did not regard himself as obligated to follow A & P.[10] We are, however, bound by that decision, although we realize that section 8(a) (3) cases raise issues perhaps not yet fully resolved by the Supreme Court. See generally Christensen & Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269 (1968); Meltzer, The Lockout Cases, 1965 Sup.Ct.Rev. 87. Therefore, we hold that there is not substantial evidence on the record to support the Board's finding that the lockout by respondents "discriminated" against Local 802 employees, "thereby discouraging membership" in that Local, and its ultimate conclusion that sections 8(a) (1) and 8(a) (3) were thus violated.
 
 
 27
 Enforcement granted in part and denied in part.
 
 
 
 Notes:
 
 
 [1]
 Local 338 is affiliated with the Bakery and Confectionery Workers International Union of America; Local 802 is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America
 
 
 [2]
 Leo Rosten in "The Joys of Yidish" (1968), p. 26 says:
 If you have never tasted a bagel, I feel sorry for you. Bagels are known as doughnuts with a college education * * *.
 
 
 [3]
 Non-members of the Council would also sign the same agreement, which became in effect an industry-wide contract
 
 
 [4]
 This proceeding is in sharp contrast to Council of Bagel and Bialy Bakers, 175 N.L.R.B. No. 148 (1969), heavily relied on by respondents, where the Board reversed the same Trial Examiner's finding of jurisdiction on a multiemployer basis. InBialy Bakers, there was no substantial history of multiemployer bargaining.
 
 
 [5]
 It is true that Local 338 stated in 1966 that its contract was solely with individual employers rather than with the Council. However, that does not require reversal of the Board's finding that the Local accepted group bargaining, a proposition with which the Local agrees in this proceeding
 
 
 [6]
 The finding regarding Local 802 is discussed below in Part III of the opinion
 
 
 [7]
 The injunction was granted with respect to Local 338 and denied as to Local 802. Kaynard v. Bagel Bakers Council of Greater N. Y., 57 Lab.Cas. ¶ 12,499 (E.D.N.Y.1968). It should be noted that, surgery completed, Glass did testify before the district court and his testimony was rejected as "implausible" and "somewhat incoherent and disjointed."Id. at 21,008 & n. 18.
 
 
 [8]
 Respondents made the same argument in this court in a motion to remand, which was denied in December 1969
 
 
 [9]
 The Board also found that the Council violated § 8(d) of the Act by failing to give proper notice to the Federal Mediation and Conciliation Service and that this also made illegal the lockout of Local 338 employees. In view of our opinion, we do not believe it necessary to discuss and resolve the questions raised by this issue
 
 
 [10]
 The Examiner noted that:
 In any event, and even assuming that this case is indistinguishable from A & P, supra, the Board has not indicated its acquiescence in that holding, and until it does so, or the question is put to rest by a decision of the Supreme Court, it is my duty to follow the Board's A & P decision.