# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00714-CR

**Noopin Simcoe, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT NO. D-1-DC-06202352, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

The trial court convicted Simcoe of burglary of a building and assessed punishment at two years in a state jail facility, probated for three years with conditions of community supervision. *See* Tex. Penal Code Ann. § 30.02 (West 2003). In two issues, Simcoe contends that the trial court erred by failing to appoint an interpreter for her at trial and that the evidence is factually insufficient to support the verdict. We affirm.

Georgiana Brown owns a mobile home and a storage shed on property located at 4806 Timber Creek Drive, Austin, Texas. Brown testified that Simcoe owns rental property with a mobile home on it at 4807 Timber Creek Drive, which is across the street from Brown's property, and that Simcoe "actually lives around the corner on the next block." On April 30, 2006, Brown visited her property with her boyfriend, son, and daughter-in-law "to mow the grass and clean the yard." She testified that the mobile home on her property had been unoccupied for "about six or eight months" prior to April 2006. According to Brown, when they arrived at the property, she noticed that the

fence along the back of her property had been taken down. She testified, "I could see the fence was rolled up laying in front of the stairs in front of the mobile home across the street" on Simcoe's rental property. Brown testified that she went inside the mobile home on her property and discovered that the stove, the refrigerator, and a cabinet were missing. Brown called the police.

Deputy Tipton Birdwell responded to Brown's call. He testified that he met with Brown and then "made contact with [Simcoe] and asked her if she had any knowledge of how the fence ended up on her property." Deputy Birdwell stated that "at that point [Simcoe] kind of went off talking about prior instances where she was a victim and complained of a lot of other things" and "then [Simcoe] said something about the owner of the property the fence came from owed her $300." According to Deputy Birdwell, Simcoe kept changing the subject when he inquired as to how the fence got onto her property and eventually began yelling at him. He testified that Simcoe said that the prior renters had taken the fence but that he "knew the prior renters had been gone awhile." Upon further questioning, Simcoe changed her story again. According to Deputy Birdwell, as he and Brown were walking around the outside of Simcoe's rental property "[Brown] recognized what she believed to be her refrigerator on the back deck of the rental property and roll of fence by the storage shed and there was a brown picnic table that was back in the back of the storage shed that she thought was hers also." Simcoe refused to let Brown and Deputy Birdwell onto her rental property and, at one point, came outside with a video camera and said, "I'll see you in court."

Detective Scott Crowe testified that, after receiving the report from Deputy Birdwell concerning the alleged theft of Brown's property, he decided to obtain a search warrant for Simcoe's rental property. He testified that he did not contact Simcoe prior to executing the search warrant based on Birdwell's report of Simcoe's actions towards him. Crowe testified, "I didn't think it

would be prudent to contact [Simcoe] and get the same attitude." He also testified that he had driven by Simcoe's rental property prior to executing the search warrant and had observed some of the items described by Brown, including the chain link fence and the refrigerator, on Simcoe's property. According to Detective Crowe, on the day the search warrant was signed, he contacted Simcoe and she allowed the officers onto the rental property. He testified that "[t]he refrigerator was still on the back porch" but that "the fencing that was in the front underneath the front porch was now gone and the fencing in the backyard was now gone as well." Simcoe led Detective Crowe around the inside of the mobile home and explained to him that she was preparing the residence for her son, who had recently been released from jail. Detective Crowe testified that the stove in Simcoe's mobile home matched the description of the stove that Brown had reported stolen from her property and that he discovered a cabinet in Simcoe's laundry room matching the description of the cabinet Brown had reported stolen. He also discovered the missing fence in a storage shed in Simcoe's backyard. According to Detective Crowe, Simcoe originally told him that she had purchased the stove, but then changed her story, claiming that a previous tenant by the name of Tracy Rickerson had stolen the stove. Crowe testified that he had reviewed the utility records for the property and that he did not see anybody by the name of Tracy Rickerson in the records. Detective Crowe placed Simcoe under arrest for burglary.

On May 26, 2006, Simcoe was indicted for burglary under section 30.02 of the Texas Penal Code. She waived a jury trial on a plea of not guilty. At the bench trial, the State presented four witnesses—Georgiana Brown, Deputy Birdwell, Detective Crowe, and Cindy Castillo, Brown's next-door neighbor. Simcoe testified in her own defense and called three character witnesses. The

3

trial court found Simcoe guilty of burglary and sentenced her to two years in a state jail facility, probated for three years with conditions of community supervision.

In her first issue, Simcoe, who is originally from Thailand and speaks both Thai and English, contends that the trial court erred by failing to appoint an interpreter for her at trial. She relies on the Texas Court of Criminal Appeals's opinion in *Garcia v. State* to support her argument. *See* 149 S.W.3d 135, 145 (Tex. Crim. App. 2004). In *Garcia*, it was undisputed that the defendant, Jose Garcia, did not speak English. The pretrial proceedings were translated for Garcia by a sworn interpreter, and defense counsel discussed Garcia's language difficulty during voir dire. The trial judge stated on the record that at "some point" during the guilt/innocence phase of the trial, he became aware that the proceedings were not being translated for Garcia. *Id.* Garcia himself testified, through an interpreter, that he had been unable to understand the complainant's testimony at trial. The court of criminal appeals held that "[s]ince the judge was aware that Garcia had difficulty understanding English, the judge was required to ensure that the trial proceedings were translated into a language which Garcia could understand, absent an effective waiver by Garcia." *Id.* The court concluded that Garcia's Sixth Amendment right to confront the witnesses against him was violated because Garcia did not knowingly or voluntarily waive his right to an interpreter. In closing, the court explained that Garcia "deserved more than to sit in total incomprehension as the trial proceeded." *Id.* (quoting *United States ex re. Negron v. New York*, 434 F.2d 386, 390 (2d Cir. 1970)).

In this case, Simcoe testified in English that she was born in Thailand and that she moved to the United States in 1978. She also testified that she learned how to speak English sixteen years ago. Simcoe answered all of the questions posed to her by the prosecutor and by her own

attorney in English and offered various explanations of how the stolen property ended up on her property in English. During cross examination, however, the following exchange occurred between the prosecutor, Simcoe, and the trial judge:

[Prosecutor]:        Ms. Simcoe, did you know Tim Brown?

[Simcoe]:        Yes.

[Prosecutor]:        When did he die?

[Simcoe]:        April.  Around April 1995 or 2005.

[Prosecutor]:        Are you sure about that date or are you guessing? If his wife stated that the day he died was November 14, 2004, do you think that would be correct?

[Simcoe]:        Yes, ma'am.

[Prosecutor]:        And according to the papers that your attorney admitted into evidence, you evicted Tracy Rickerson on September 21, 2005?

[Simcoe]:        Yes, ma'am.  October of that 2005.

[Prosecutor]:        And after Mr. Rickerson moved out of your house, did you begin at that time to prepare it for your son to move into?

[Simcoe]:        No, ma'am, my son in jail, county state jail.

[Prosecutor]:        So after Mr. Rickerson moved out, was the property empty until your son was released from jail?

[Simcoe]:        Cannot lend again he abandoned my home.

[Prosecutor]:        I'm sorry.

[Simcoe]:        Cannot able to lend again.  Mr. Tracy Rickerson abandoned my home.

| [Prosecutor]: | So it was vacant until your son moved in. So no one lived there between Mr. Rickerson and your son? |
|---|---|
| [Simcoe]: | No, ma'am. |
| [Prosecutor]: | Your Honor, may I approach the witness? |
| [The Court]: | Yes. Approach the bench first. |
| | (Discussion off the record) |
| [The Court]: | Let's go [b]ack on the record. Ms. Simcoe, do you understand the questions being asked? |
| [Simcoe]: | Some, sir. I could say—I'm sorry. |
| [The Court]: | Let's take a short recess to see if—I know we can't get anybody here as an interpreter but to see if court administration has access. You are from Thailand? |
| [Simcoe]: | Yes, sir. |
| [The Court]: | Thailand. That would be Thai. |
| [Simcoe]: | Yes. |
| [The Court]: | Let's just pause a few minutes. Stella is going to call right now. |

After a recess, the prosecutor resumed questioning Simcoe, and Simcoe continued answering the questions posed to her in English. The record contains no further mention of requiring the services of an interpreter for Simcoe. On appeal, Simcoe contends that the exchange quoted above demonstrates that the trial judge was aware that she did not understand English and, therefore, had a duty to appoint an interpreter for her absent an effective waiver.

This case differs from *Garcia.* In *Garcia*, it was undisputed that Garcia did not speak English. Garcia testified through an interpreter that he did not understand the complainant's

testimony, which was in English and was not translated to him. In holding that the trial court's failure to appoint an interpreter for him at trial violated Garcia's constitutional rights, the court of criminal appeals stated that "Garcia 'deserved more than to sit in total incomprehension as the trial proceeded.'" *Id.* In this case, unlike *Garcia*, Simcoe testified that she understood and spoke English. She answered the questions posed to her in English. Although Simcoe gave conflicting answers to some of the questions posed to her, the record reflects that any confusion generated by Simcoe's responses to questions was likely more a function of her attempts to create confusion rather than an honest failure to understand the questions posed. Moreover, both Deputy Birdwell and Detective Crowe testified that they communicated with Simcoe in English. According to Deputy Birdwell, who had dealt with Simcoe approximately 15 or 20 times prior to the reported theft of Brown's property, Simcoe was not hard to communicate with "[a]s long as she wasn't excited. When she is excited she talks a little fast, hard to understand." The evidence at trial also established that Simcoe, as a landlord, understood English well enough to contract with English-speaking tenants and to procure an eviction from a justice of the peace when one of her tenants breached the lease agreement.

Although the record reflects one instance where the trial judge considered the issue of whether Simcoe needed an interpreter, the record is silent as to the resolution of that issue. We have reviewed the record, including Simcoe's testimony. Although the record demonstrates that Simcoe often answered the questions posed to her in imperfect English and gave conflicting answers, it does not demonstrate that Simcoe was unable to understand English or to participate in the trial in a meaningful manner without the assistance of an interpreter. Simcoe did not "sit in total incomprehension as the trial proceeded" like the defendant in *Garcia. Id.* Under these

7

circumstances, the trial judge did not commit error when he allowed the trial to proceed without appointing an interpreter.

In her second issue, Simcoe contends that the evidence is factually insufficient to support her conviction. In a factual sufficiency review, we view the evidence in a neutral light and ask whether a finder of fact was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Id*. at 417.

A person commits the offense of burglary if, without the effective consent of the owner, the person enters a building (or any portion of a building) not then open to the public, with intent to commit a theft. *See* Tex. Penal Code Ann § 30.02(a)(1). The finder of fact is exclusively empowered to determine the issue of intent, and the events of a burglary may imply the intent with which the defendant entered. *Moore v. State*, 54 S.W.3d 529, 539 (Tex. App.—Fort Worth 2001, pet. ref'd). Thus, intent may be inferred from the defendant's conduct and surrounding circumstances. *Id.*

In this case, Brown's next-door neighbor, Cindy Castillo, testified that she had seen Simcoe on Brown's property "more than once" and had also seen Simcoe enter the storage shed on Brown's property "more than once." Castillo also testified that she had seen Simcoe removing the fence from Brown's property as follows:

8

[Prosecutor]: Have you ever seen Ms. Simcoe remove items from Ms. Brown's property?

[Castillo]: Yes. Just the fence.

[Prosecutor]: What specifically did you see her doing?

[Castillo]: Well, when I was driving home from work one afternoon I saw her putting up a fence in her—trying to put a fence in her front yard. I went and asked her because I am missing two rows of fence. I went to go ask her about it. When I was approaching her she was already coming back with some more fence, like the bars of the fence.

[Prosecutor]: The poles?

[Castillo]: Yeah, the poles, and I had asked her—that's when I asked her where did you get that fence from because I'm missing some fence myself and she said oh, no, no, no, I got it from Tim because Tim told me I could have it.

[Prosecutor]: When she used the name Tim, who was she referring to?

[Castillo]: Tim who is deceased.

[Prosecutor]: He previously owned which property?

[Castillo]: The one next door which Georgiana [Brown] now owns.

[Prosecutor]: And when she stated that he had given her permission, did you ask her any further questions about how that had happened?

[Castillo]: Yes, she told me spiritually he talks to her; his ghost talks to her and she communicates with him all the time.

[Prosecutor]: At the time she made that comment, approximately how long had Mr. [Tim] Brown been deceased?

[Castillo]: I would say it was probably six to seven months, around that range.

9

| [Prosecutor]: | So when you encountered her, she had the fencing materials, what property was she coming from at that time? |
|---|---|
| [Castillo]: | Georgiana's. |

In addition to this testimony, Deputy Birdwell testified that during his initial meeting with Simcoe, she "said something about the owner of the property the fence came from owed her $300," essentially acknowledging that the fence had been taken from someone else's property. However, Brown testified that she did not give Simcoe permission to remove any items from her property, storage shed, or mobile home.

Although Simcoe offered various explanations of how the stolen property ended up on her rental property—including that either her son, a former tenant, or Brown's son, Daniel Rice, removed the items from Brown's property—the trial judge, as the sole judge of the credibility of the witnesses and the weight of their testimony, was free to believe or disbelieve all or any part of Simcoe's testimony. *See Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). Furthermore, the evidence adduced at trial, including Simcoe's testimony, showed that the mobile home on Simcoe's rental property was unoccupied during the time period when the items were removed from Brown's property and mobile home. Although Brown testified that her son, Daniel Rice, was the last person to live at the mobile home on her property and that "he did sell a shelter that was on the property that was recovered," she also testified that the items that she reported stolen were still in the mobile home at the time Rice moved out. Brown also testified that Rice did not have a key to the mobile home during the time period when the stolen items were removed from her property and mobile home. Viewing the record in a neutral light, we cannot say that the great weight

10

and preponderance of the evidence contradicts the verdict.  The evidence is factually sufficient to support Simcoe's conviction for burglary.

Affirmed.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   August 29, 2007

Publish